GREAT NORTHERN RY. CO. v. ENNIS et al.

(Circuit Court of Appeals, Ninth Circuit. September 5, 1916.)

No. 2598.

1. RAILROADS ⊘348(1)—CROSSING ACCIDENTS—EVIDENCE.
   In an action against a railroad company for the death of a traveler whose team was frightened by the carcass of a dead horse on the right of way, evidence *held* to warrant a finding that the horse on the right of way was killed by a train.
   [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1138, 1140, 1141; Dec. Dig. ⊘348(1).]

2. RAILROADS ⊘305(3)—CROSSING ACCIDENTS—LIABILITY OF COMPANY.
   Where a railroad company allowed the carcass of a horse killed by one of its trains to remain on its right of way near a railroad crossing, emitting offensive odors, the company is, under Rev. Codes Mont. §§ 6162, 6163, declaring anything injurious to health or offensive to the senses to be a nuisance, and that a public nuisance to be one which affects members of the community, liable for damages occasioned by the nuisance, including the frightening of passing teams.
   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 971; Dec. Dig. ⊘305(3).]

3. RAILROADS ⊘350(15)—CROSSING ACCIDENTS—ACTION—JURY QUESTION.
   In an action for the death of a traveler killed when her team took fright at the putrefying body of a horse on railroad right of way and ran off, the question whether the traveler or her agents were guilty of negligence in taking that particular road, where there was another road which could have been used and the presence of the dead horse was known, *held* for the jury.
   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1168; Dec. Dig. ⊘350(15).]

4. RAILROADS ⊘324(1)—CROSSING ACCIDENTS—LAST CLEAR CHANCE DOCTRINE.
   Where a traveler's team took fright at the putrefying body of a dead horse lying near a railroad crossing and ran away, the last clear chance doctrine has no application on the theory that the traveler should have taken another road knowing of the presence of the dead horse.
   [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1020, 1022, 1023; Dec. Dig. ⊘324(1).]

5. NEGLIGENCE ⊘132(3)—EVIDENCE—HABIT—ADMISSIBILITY.
   Where it was claimed that the driver of a traveler, killed when her team ran off on seeing a dead horse on a railroad right of way near the crossing, was intoxicated and negligent, evidence that the driver was habitually a drinking man is not admissible; proof of his habit not being proof of his condition at the time of the accident.
   [Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 259, 260; Dec. Dig. ⊘132(3).]

⊘For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.
236 F.—2

6. EVIDENCE ☜577—FORMER TESTIMONY—ADMISSIBILITY.

Under Rev. Codes Mont. § 7887, declaring that the testimony of a witness deceased, or out of the jurisdiction, given in a former action between the same parties, relating to the same matter, is admissible, evidence of plaintiff's witness given at a former trial between the same parties is admissible where at the time of the second trial he was without the state.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2406; Dec. Dig. ☜577.]

7. APPEAL AND ERROR ☜1047(3)—REVIEW—HARMLESS ERROR.

Where evidence of inconsistent statements made by a witness out of court was mere hearsay, any error in the refusal of the court to permit defendant, the transcript of the witness' testimony at a former trial being read on account of his absence from the state, to withdraw a statement that questions as to the witness' inconsistent statements were not for impeachment, was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4149; Dec. Dig. ☜1047(3).]

In Error to the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Action by Herbert L. Ennis and another against the Great Northern Railway Company, a corporation. There was a judgment for plaintiffs, and defendant brings error. Affirmed.

This action was brought to recover damages on account of the death of the wife of the defendant in error Herbert L. Ennis and mother of the other defendant in error, who were plaintiffs in the court below; her death resulting from being thrown from a buggy at the time drawn by a runaway team of horses in charge of one Bigelow, an employé of the husband of Mrs. Ennis.

The case was twice tried and the complaint twice amended. That upon which the last trial was had alleged, among other things, that the plaintiff in error (one of the defendants to the action in the court below) owned and operated at the time in question a line of railway across the state of Montana and across Valley county of that state and owned in connection with its railway a right of way which at the place where the accident occurred embraced a strip of ground about 75 feet wide on each side of the railway track, of which section of the railway one John Hamilton (also made a defendant in the court below) was section foreman, whose duty it was, among other things, to abate any nuisance, public or private, that might exist on that portion of the said right of way; that some years before the accident the county commissioners of Valley county, on proceedings taken for the purpose, undertook to lay out for use by the traveling public a certain roadway across the right of way of the defendant company at a certain point on the section under the supervision of Hamilton, which roadway was about 60 feet in width and crossed the railway track under permission of the defendant railway company, and was open to travel by the public, and extended to the town of Bainville in Valley county, where a post office is maintained, and to points beyond, since which time the said roadway has been at all times used by the traveling public as if it were a public highway, and has been so treated by the commissioners of the county in the expenditure of money in its opening, maintenance, and repair; that the defendant company placed and maintained across its tracks a plank crossing on said roadway for use by the traveling public, and placed, and has since maintained where the roadway crosses its right of way, a warning signal that a public crossing existed there, and installed and has since maintained fences and cattle guards bordering the said roadway where the same crosses its right of way, and has since the year 1906 treated the said roadway where it crosses its right of way as if it were a regularly laid out public highway, and has thus

invited the use of the roadway by the traveling public; that during the month of December, 1908, the defendant company placed "on its said right of way and in close proximity to the said traveled roadway, and in such position so that it could readily be seen by animals traveling on said roadway as it crossed said right of way, the carcass of a horse"; that the defendant company permitted the carcass to remain where it was so placed until April 18, 1909, undergoing decomposition and exhaling noxious odors, so that, on the day last mentioned, and for some time prior thereto, it had become and was a public nuisance and an object likely to frighten teams driven along the said roadway, all of which the defendants knew, or in the exercise of reasonable diligence should have known; that on the day last mentioned Mrs. Ennis was being driven by one Bigelow with a gentle team along the roadway, when the team became frightened by the carcass and the odor therefrom and ran away, although the driver was exercising due care, resulting in her being thrown from the buggy and receiving injuries which caused her death.

In its answer to the second amended complaint the defendant railway company admitted its ownership and operation of the railway and right of way as alleged, and that its codefendant Hamilton was at the time of the accident in question, and for more than a month prior thereto had been, section foreman of that part of the road where the accident happened, and admitted the crossing of its right of way by the roadway as alleged, and the existence of the alleged fences and cattle guards, and admitted the laying of the carcass of the horse as alleged, the driving of Mrs. Ennis by Bigelow in a buggy drawn by a pair of horses in the attempt to cross the railway track, and that the team became frightened and ran away, resulting in the injuries to Mrs. Ennis and her death from them, but denied that the horses became frightened by the carcass or that the runaway was in any manner or to any extent caused by it. And for a separate answer the defendant railway company set up that, if it "was in any respect negligent in any of the matters stated in the second amended complaint herein, then and in that event plaintiffs' damage, if any, was due to, and caused by, their own contributing fault and carelessness, and to the contributing fault and carelessness of said Nettie Ennis, their and her agents, servants, and employés, and each of them to exercise such reasonable care and caution, for the safety of said Nettie Ennis, as would, could, and should, and ordinarily would, have been exercised by the average reasonably prudent person, under all the circumstances then and there existing, at all times and places stated in the complaint; and to the fact that the said Nettie Ennis and the said John Bigelow so negligently drove the said team of horses that the same ran away and escaped from their control. Further answering, this answering defendant says that, if the matters of fact stated in said second amended complaint are true, then and in that event, in the exercise of such reasonable care and caution as the average reasonably prudent person, under all the circumstances then and there existing, would, could, and should, and ordinarily would, have exercised, the plaintiffs, the said Nettie Ennis, their and her agents, servants, and employés and the said John Bigelow would have known—and, in fact, actually did know—the facts stated in said second amended complaint, if the same were or are true and they, and each of them, had the last clear chance to avoid the alleged negligence of this answering defendant and the damages, if any, resulting therefrom, and to avoid the said runaway and by the exercise of such reasonable care and caution aforesaid, as the average reasonably prudent person, under all the circumstances, would, could, and should, and ordinarily would, have exercised, they, and each of them, could, should, and would, and ordinarily would have discovered and avoided the alleged negligence, if any, of this answering defendant, and the alleged dangers alleged in the complaint."

The replication of the plaintiffs put in issue the allegations of the second separate answer.

Veazey & Veazey, of Great Falls, Mont., for plaintiff in error.

Walsh, Nolan & Scallon, of Helena, Mont., and R. O. Lunke, of Sidney, Mont., for defendants in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). We pass without comment the many manifestations of feeling disclosed by the transcript in this case, both on the part of counsel and the court, in the hope that we shall not see here another such record.

The issues between the parties were few and simple: Was there negligence on the part of the defendant company? If so, was it the cause of the death of Mrs. Ennis, and was there such contributory negligence on her part as precluded a recovery for damages by the plaintiffs?

[1, 2] The testimony of Hamilton was that at the time of the accident he was not section foreman, but was at that time engaged in prospecting for gravel.

"I started to prospect for gravel the same day the horse got killed," said the witness. "I saw the horse there that same day. It was discovered in the morning about 7 or 8 o'clock. The horse was then dead. I had been over that place the day before about half past 4 or 4 o'clock. There was nothing there then. I made an examination of the horse the next morning at half past 8 o'clock. The horse was cut on the hip. The skin was broken. The horse was about 16 or 17 feet on the outside of the rail. The horse lay between the space between the wind fence and the cattle guard. I don't know exactly how far up. I would say it was about 10 feet from the cattle guards. Trains passed through there in the nighttime. During the night preceding the morning when I first saw this carcass on this roadway, there were two passenger trains during the night and several freight trains—I don't know how many. I did not see any freight trains there myself during the night; I didn't hear any, that I remember now. I didn't pay any attention to trains going through there. Under the schedule that worked there, there were trains scheduled to go through there in the nighttime. * * * It was not my duty to make any report as to animals killed by trains. I was not section foreman at that time. I had charge of something else. I was prospecting for gravel at that time. Another foreman was in charge of the section at that time. As section foreman, it was my duty to report about cattle killed by the trains. I did not make any report about this horse being killed myself. * * * The section foreman put ties on the animal to burn it that same morning. I was on a saddle horse, and he came around in a hand car, and he discovered the horse, at the same time he went around. The carcass was on the south side of the track, and on the road side of the fence."

The witness George Anderson testified as follows:

"I am assistant roadmaster for the Great Northern, and held that position in the spring of 1909. As such officer, I had jurisdiction over the section foremen along my line of route. My duty is to look after the road in general, including the right of way fence and including cleaning up the right of way and keeping up the road fence. As to removing any obstructions that might be on the right of way, such as dead animals, and things of that kind, I bury them. I had jurisdiction over that, too. I had no jurisdiction at all in relation to ascertaining how animals that were on the right of way got there. My jurisdiction would simply extend to disposing of the carcass after it got there. I saw the carcass which is said to be the cause of the runaway in question. I saw it there different times between December, 1908, and the spring of 1909. My recollection would be that it came there in December. As assistant roadmaster, I gave directions as to any disposition to be made of it. On account of the ground being frozen, and it being a hard matter to bury it, I instructed the foreman to burn it. I do not know how it came there. No claims come to me for animals killed by the railroad. They burned it twice that I know of, and probably three times."

The circumstances disclosed by the evidence were sufficient to justify the jury in concluding that the horse was killed by a passing train.

Thompson on Negligence, § 2194. And if the defendant company permitted the carcass to remain upon its right of way and emit offensive odors close to a roadway traveled by the public, there can be no doubt of its liability for damages occasioned by such nuisance. Revised Codes of Montana, §§ 6162, 6163; Wood on Nuisances (3d Ed.) § 115; Ellis v. Kansas City, etc., Ry. Co., 63 Mo. 131, 21 Am. Rep. 436; City of Richmond v. Caruthers, 103 Va. 774, 50 S. E. 265, 70 L. R. A. 1005.

[3-4] The husband of the deceased testified, among other things, that he had owned the team of horses in question from four to six weeks, and had known them for about six months; that Bigelow, who he said was a good horseman, was in his employ at the time; that he himself drove the team a good deal; that the horses were well broken, and that his wife also drove them, which he would not have permitted her to do if he had not considered them gentle; that about the last of December or the first of January, and three or four days after the carcass was first there, he saw Hamilton pile ties on the carcass of the horse and set them on fire; that the carcass was frozen, and as a consequence about all that was accomplished was the burning of the hair; that subsequently he saw the carcass frequently in going to Bainville, always seeing it except when it was covered with snow more or less.

"Sometimes," said the witness, "it would be seen plainly, and sometimes it would be buried in snow, so that it would be pretty hard to see it. I think the last time I went across there prior to the accident was Thursday evening, if I remember right. The accident happened on Sunday, the 18th of April. During the time that the carcass was there I drove there frequently back and forth, crossed there. I had been driving those horses back and forth for about four or five weeks."

The witness further testified that after the weather began to get warm he noticed odor from the carcass, which grew stronger as the month advanced; that that season it was pretty cool until the first of April, after which the smell became perceptibly stronger.

"By the Thursday before the accident," said the witness, "the dogs and coyotes had worked on that carcass during the winter in frozen weather, and had eaten up the upper portion of it. The under side of it laid on the ground. That was pretty near all intact. The bones held up there, and the skin was on the head and back and shoulders. That was pretty near perfect. The upper ribs, as it looked to me, had been eaten off. The meat had been eaten off of that portion. The ribs were still attached to the backbone, and you could see space plainly between them. There was no connection between the ribs. The outer portion of the body had been eaten away, and the lower portion as it lay on the ground, the major portion of it, was there yet. At the time of the accident the carcass was not far from the traveled road. It was somewhere in the neighborhood of 12 or 14 feet from the driveway on the right-hand side as you go towards my house from Bainville, or on the left-hand side as you go from my house towards Bainville. I have had considerable experience in handling horses all my life. Yes, sir; I have handled horses on the range. Yes, sir; I have encountered carcasses on the range when I was handling horses. As to whether or not a carcass like that would have a tendency to frighten horses, it always does."

There was other testimony given tending to show that the carcass of a horse, especially when in a condition to emit strong odors, not

only has a tendency to frighten a team of horses, but may make them run away. On the part of the defendant, there was testimony given tending to show that the carcass in question would in no manner tend to frighten horses.

Undoubtedly, both Ennis and his wife, as well as Bigelow, knew of the existence of the carcass, for the evidence without conflict shows that it had lain where it was for months, and the latter two had passed it on the way to Bainville the day of the accident. It is conceded that mere knowledge of an obstruction in or along a highway is not always enough to establish contributory negligence as a matter of law in one who attempts to pass it, but that whether such a person is negligent in attempting to pass such a known obstruction, or in not avoiding it, is ordinarily a question for the jury. But it is contended that in this case because the plaintiff Ennis and his wife and Bigelow all knew of the existence of the carcass, and because whatever dangers flowed from it were peculiarly known to those familiar with horses, as were the parties mentioned, and because the plaintiff knew, as the evidence showed that he did, that the railroad company had attempted to burn the carcass, and because he made no complaint to the company in respect to it, and because the carcass "could easily have been removed by him with a shovel or team," and because the evidence showed that there was another road leading to Bainville variously stated at from 2½ to 5 or 6 miles longer, it is insisted that the issue of contributory negligence was established as a matter of law and that the trial court should have so held.

We think the case of District of Columbia v. Moulton, 182 U. S. 576, 21 Sup. Ct. 840, 45 L. Ed. 1237, cited by the plaintiff in error in support of the contention, wholly unlike the present one. There the steam roller which frightened the horse of the plaintiff in the action in passing it on Park street, in the city of Washington, was lawfully on that street where it had been used in resurfacing the street with macadam. The court said, among other things:

"That the plaintiff had notice of the presence of the roller on Park street in ample time to have avoided it is undisputed. When he turned from Fourteenth street into Park street, it was broad daylight, there was nothing to obstruct his view westward, and in fact he testified that the roller was in plain sight. He was not induced or directed by the agents of the district to proceed past the roller. He knew that such objects sometimes frightened horses, but from his acquaintance with the disposition of his horse he believed that he could control the animal and drive safely past the roller, and he voluntarily undertook to do so. Now, it seems clear—particularly as the danger was neither hidden nor concealed—that the district was under no obligation to restrain the plaintiff from attempting to pass, either by closing Park street or by other means. The district was not bound to presume that it would be necessarily hazardous to attempt to drive past the roller, stationary and quiet as it was, and familiar as horses in a large city usually are to the sight and sounds of electric and cable cars and horseless motors. The district, at best, was only chargeable with notice that the roller was an object which might frighten some horses of ordinary gentleness, not that it would inevitably do so. It was bound to give sufficient notice to drivers of the presence of the roller in time to enable them to avoid passing it, if desired. The district, however, had a right to assume that a driver of mature age was familiar with the habits and disposition of his horse, and was possessed of the common knowledge respecting the tendency of steam rollers to occasionally frighten such animals. The roller being law-

fully on the street, the district was not bound to guard against the consequences of a voluntary attempt to drive by this roller. Certainly, if a driver believed that it would not be the natural and proper consequence of such an attempt that his safety would be endangered, the district ought not to be charged with notice that the attempt would be dangerous either to life or to limb."

In the present case, the railroad company had no legal right to leave the carcass of the horse within its right of way, the direct tendency of which, according to testimony on the part of the plaintiffs, might cause injury to people passing along the roadway. It need hardly be said that Ennis was under no obligation to bury or remove it.

The evidence showed without conflict that for many years the roadway had been traveled by the public without objection, if not by invitation of the railroad company, many times by the plaintiff Ennis, his deceased wife, and Bigelow, and on different occasions with the horses in question, which, according to testimony on the part of the plaintiffs, was a gentle and tractable team, while, on behalf of the defendant, there was testimony tending to show that it was a nervous and high-strung one.

Bigelow, the driver, testified that, just before the horses became frightened by the carcass and the odors therefrom, they had been frightened by a piece of paper and then attempted to run away, but from that fright he had succeeded in quieting them and gotten them to going steadily when very shortly afterwards they approached the carcass and again became frightened and the accident happened. Whether it was the paper or the carcass which caused the runaway and the death of Mrs. Ennis the trial court left to the jury to determine under very plain instructions which are not complained of, and so were the instructions in respect to the alleged negligence of the defendant company clear and correct.

There was, however, testimony given by a witness for the defendant company named Hubener tending to show that, while in Bainville on the day of the accident, Bigelow had taken one or two drinks, and there was also testimony tending to show that there was the smell of liquor on his breath. On that point the trial court instructed the jury as follows:

"The issue in reference to the contributory negligence alleged against the driver Bigelow and, in reference to that, all the court has heard in the way of evidence, is that Bigelow had been drinking that day, a drink or two, seems to be all the direct evidence. Possibly you would say one drink is all that is actually proven; but it is for you to say because the witness Hubener was the defendant's witness, and, if he is in doubt, you have the right to take the most favorable view of the evidence for the plaintiffs. There is other evidence that witnesses smelled liquor on Bigelow's breath, saw a bottle in his pocket. They do not describe the bottle, but, perhaps, under all the circumstances, it would be a fair inference that it was a bottle of liquor of some kind. Outside of this, the evidence shows there were other horses which passed there, and had not been seriously frightened, and you would have a right to infer that it would not frighten horses that were driven with ordinary care. There is not much evidence from which you might infer negligence on the part of Bigelow; at the same time the court will leave it to you to say, under proper direction, as to the charge against Bigelow. The charge, of course, would be thrown over to these plaintiffs as to whether Bigelow was negligent himself. 'Contributory' negligence means that a

party who is laying a claim against another person for his negligence was himself lacking in ordinary care due for his own safety, under the circumstances, and that, because of that, contributed to his injuries. In other words, if he had not been negligent, the injury would not have happened; that even though the defendant company was negligent in leaving the horse there, and even though it frightened the team, yet if Bigelow had driven with ordinary care, and thus prevented the accident, and could have prevented the accident that happened, why then his negligence contributed to the injury; and, since he was the servant of Mr. Ennis and Mrs. Ennis, they would not be entitled to recover in this case. Now, that is for you to determine. Now, this condition the defendant must prove, and prove to your satisfaction by a preponderance of the evidence. * * * In my opinion, the evidence of contributory negligence would be very slight. But you are not bound by that opinion. You have a right to infer it from the fact that Bigelow had some drinks; but I imagine most men take a drink or two occasionally, and the question is whether that incapacitated him so that he, when driving across the crossing, where the carcass was, was not acting as a reasonably prudent man should. Unless you find by a preponderance of the evidence that he did not so drive, why, you put the question of contributory negligence out of sight."

No exception was taken to this instruction.

The defendant company did, however, except to the action of the court in holding that the deceased and her driver were not obliged to take the other road mentioned instead of the one along which the carcass of the horse lay, and that the doctrine of the last clear chance rule contended for by the defendant company was inapplicable to the case.

In concurring in that view, we think it sufficient to say that there was obviously no chance, clear or otherwise, to take the other road when the trouble that caused the accident began. All that it was then possible for the driver to do was to hold and drive the horses as best he could in the place where they were and under the conditions then and there existing. Neither the driver nor Mrs. Ennis, any more than any other of the public, was obliged by the last clear chance rule to abstain from traveling the roadway in question while the carcass of the dead horse remained where it was, the effect of which, according to testimony on behalf of the plaintiffs, might cause injury to passers-by, and, according to testimony on behalf of the defendant, would have no such effect. The duty imposed by the rule referred to is "to avert the threatened injury after the perilous situation is actually discovered." Dahmer v. Northern Pacific Ry. Co., 48 Mont. 161, 136 Pac. 1059, 142 Pac. 209. The record here shows without dispute that this roadway was regularly traveled by the public, including the plaintiff Ennis, his deceased wife, and Bigelow, while the carcass lay where it was, and that it had been passed without trouble by Bigelow and the deceased on the day of the accident on their way to Bainville; the runaway occurring on the return trip.

[5] It is also insisted that the court below erred in refusing to permit the defendant company to prove that Bigelow was by habit a drinking man—from which, as the court below said, to raise a presumption that he had drunk to excess at the time in question, from which to presume that he drove negligently, from which to presume that his negligent driving contributed to the injury complained of.

We are of the opinion that the ruling of the trial court was right. Evidence in respect to the driver's drinking on the day of the accident was permitted to go to the jury on the question of the alleged contributory negligence, for such weight as they should deem it entitled to. The principle which we think should control the contention here made, that the defendants should have been allowed to show that on other occasions Bigelow was in the habit of drinking to excess, was announced by the Supreme Court in the case of Thompson v. Bowie, 4 Wall. 463, 18 L. Ed. 423. That case was an action brought to recover on certain promissory notes. Bowie, the maker, sought to avoid payment on the ground that the notes were founded on a gaming consideration and therefore void. There was no direct evidence offered at the trial to impeach the consideration of the notes, and circumstantial evidence only was relied upon. The trial court permitted a brother of the defendant to testify that whenever his brother was under the influence of liquor he had a propensity to gamble, and as the maker was drunk on the morning the notes were given, and as they were in the handwriting of a professional gambler, payable to the keeper of the gambling house, the inference was that they were given for money won at play. The court, in disposing of the question, said:

> "All evidence must have relevancy to the question in issue, and tend to prove it. If not a link in the chain of proof, it is not properly receivable. Could the habit of Thomas J. Bowie to gamble, when drunk, legally tend to prove that he did gamble on the day the notes were executed? The general character and habits of Bowie were not fit subjects of inquiry in this suit for any purpose. The rules of law do not require the plaintiff to be prepared with proofs to meet such evidence. That Bowie gambled at other times, when in liquor, was surely no legal proof that because he was in liquor on the 1st day of January, 1857, he gambled with Steer. It is very rare that in civil suits the character of the party is admissible in evidence, and it is never permitted, unless the nature of the action involves or directly affects the general character of the party. 1 Greenl. Ev. § 54. Bowie was not charged with fraud, or with any action involving moral turpitude. He was simply endeavoring to show that his own negotiable paper was given for money lost at play; and to allow him, as tending to prove this, to give in evidence his habit to gamble when drunk, would overturn all the rules established for the investigation of truth."

[6] The only other point made for the appellant that we need to specifically mention arose out of the offer and admission of the testimony of Bigelow on the first trial of the case and the attempt on behalf of the defendant company to show that the witness had made other inconsistent statements.

The record shows that on the trial under consideration the plaintiffs offered in evidence the transcript of the testimony of Bigelow given on the first trial, under this stipulation:

> "It was stipulated between the parties that the driver, Bigelow, was not now in the state of Montana, and was probably in the state of South Dakota, and that the transcript was a true transcript of what the witness Bigelow testified to at the former trial."

The defendant, however, contended that before such testimony could be admitted it was essential for the plaintiffs to show, not only that

the witness was out of the state of Montana, but that his absence was permanent, or indefinite.

We think the contention answered by the statute of Montana, which declares:

"In conformity with the preceding provisions, evidence may be given upon a trial of the following facts: * * * (8) The testimony of a witness deceased, or out of the jurisdiction, or unable to testify, given in a former action between the same parties, relating to the same matter." Section 7887, Rev. Codes Mont.

Apart from the statute, however, we are of the opinion that the testimony was admissible. In Chicago, St. P., M. & O. Ry. Co. v. Myers, 80 Fed. 361, 365, 25 C. C. A. 486, 490, the Court of Appeals of the Eighth Circuit said:

"The defendant company assigns for error that the trial court wrongfully excluded a stenographic report of the testimony of a witness by the name of Moses R. Dickey, which had been given on a former trial of the case, after the defendant company had shown that the said Dickey was a resident of the state of Ohio, and that the defendant had been unable to procure his attendance at the second trial. The rule appears to be established in Minnesota—where this case was tried—that such testimony is admissible. Minneapolis Mill Co. v. Minneapolis & St. L. Ry. Co., 51 Minn. 304, 53 N. W. 639; King v. McCarthy, 54 Minn. 190, 55 N. W. 960. And the same rule, it seems, prevails in some other jurisdictions. Railway Co. v. Elkins, 39 Neb. 480, 58 N. W. 164, and cases there cited. We can see no substantial objection to the admission of such testimony when, on the first trial, the witness was fully examined and cross-examined, provided, always, that the stenographic report of his testimony is proven to the satisfaction of the trial court to be correct, by the person by whom it was reported, and provided further that the witness is beyond the reach of the process of the court, and his personal attendance cannot be secured."

In 5 Encyc. of Evidence, p. 904, the rule is thus stated:

"The absence of a former witness from the state is sufficient ground for admitting proof of his former testimony"—citing many cases.

And in Wigmore on Evidence, § 1404, it is said that where the witness is out of the jurisdiction, and it is therefore impossible to compel his attendance, his testimony given at a former trial is generally accepted.

[7] In the course of the testimony of Bigelow so introduced, he gave a detailed statement of his familiarity with the roadway, the team of horses in question, of the trip to Bainville, and of the accident on the return trip, and of the piece of paper that has been mentioned, saying, among other things, on cross-examination:

"That piece of paper blew across the road between the house and the Hanson gate, about ten rods from the house. It just blew across the road, and went on down another part of the country. * * * These horses took fright at this piece of paper like any ordinary horses, just kind of shied out to one side a little bit. I pulled them right up, and they settled down and seemed to be as calm and cool as could be. It was not over two or three minutes that I took to calm them down and get them cool. It was about a minute until I had them down to a walk. I just pulled them down and got them on a walk. * * * As to whether I have testified to the effect that it was the blowing of the paper across our path that frightened them, well, it was fluttering there and then blew across. As regards which frightened them, the fluttering or the blowing across, it was the blowing across. The

fluttering frightened them first, and then the blowing across. A small piece of paper fluttering on the bush started them first."

## The record proceeds:

"Thereupon there was offered and received in evidence a written statement, signed by the witness, and referred to in this testimony, reading as follows: 'A small piece of paper on a bush fluttered considerably close to this crossing, which frightened the team. This was about at the bottom of the hill referred to. I had just got the team quieted down when we reached the fill or approach to the track, and at that moment the wind blew the odor from the dead carcass right toward them, which frightened the team, so that they became unmanageable and ran away.'

"As to whether, as I approached this crossing, I did not expect the horses to be frightened to such an extent that they would get beyond control, I had a tight hold on them in case; I thought I had control over them enough to hold them. No, as I approached this crossing I did not expect the horses to be frightened to such an extent that they would get beyond control. No, sir; I had not been drinking any that day. As to whether I am a drinking man, yes, sir, I take a drink. I was not drinking intoxicating liquors prior to that time to excess.

"The remainder of said transcript of the testimony of the witness Bigelow, as given at the last trial, read as follows: 'Q. Do you remember at any time, or did you at any time state to any one at any place, that it was this piece of paper which caused this runaway, and not this carcass? By General Nolan: I object to that. This is a witness in the case, and I suppose if there is some evidence it was made in some particular statement. By the Court: Sustained. By Mr. Veazey: We are not laying the foundation for impeachment, but are inquiring for evidence. By General Nolan: Well, then, if you are not, the testimony is incompetent. Of course, any statements made by this man would be hearsay, except in so far as this statement would be contradictory to anything he has said on the stand here. By the Court: I will allow him to answer the question. Q. Did you ever at any time or at any place make any statements to any one to the effect that this runaway had been caused by the horses becoming frightened at the piece of paper, and not by the carcass? A. No, sir.'

"Before the first question above set forth, beginning with the words, 'do you remember at any time, or did you at any time,' etc., was read, counsel for the defendant advised the court that defendant desired to withdraw said question, and to waive it, and advised the court that, if the witness were present, an impeaching question would be propounded, since impeaching testimony was not available, and defendant demanded that the witness be produced, in order that an impeaching question might be propounded; but the court declined to allow said question to be withdrawn. To which ruling of the court defendant, by its counsel, then and there duly excepted. Which said exception was thereupon noted and allowed. And the court likewise overruled the demand of the defendant that said witness be produced. To which ruling of the court the defendant, by its counsel, then and there duly excepted. Which said exception was thereupon duly noted and allowed.

"Likewise when that part of said transcript, containing the objection to said question and the court's ruling sustaining the said objection, and the declaration by counsel for the defendant that defendant was not laying the foundation for impeachment, but was inquiring for impeaching evidence, was read, counsel for defendant advised the court that defendant desired to withdraw said disclaimer that it was not laying the foundation for impeachment, and counsel stated that, at the time of the former trial, the defendant did not have any impeaching testimony, and was forced to inquire of the witness as to whether there was any, and could not call his attention to any particular statement or impeaching testimony, but that since then impeaching testimony had been procured, and defendant desired, therefore, to withdraw said disclaimer and to impeach the witness. By the Court: The court will not permit it. Now, we will hear what the witness has to say and bring that up later. To which ruling of the court the defendant, by its counsel, then and

there duly excepted; which said exception was thereupon duly noted and allowed. Thereupon, the testimony of said witness, as above set forth in said transcript, was read to the jury."

Sections 8022 and 8025 of the Revised Codes of Montana provide as follows:

"Sec. 8022. The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in section 8025."

"Sec. 8025. A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them."

In speaking of those statutory requirements, the Supreme Court of Montana, in the case of State v. Burrell, 27 Mont. 285, 70 Pac. 982, said:

"Owing to the frequency with which able counsel raise the point, and contend for it in this court, that when, on cross-examination, a witness is asked if he has not at other times made statements inconsistent with his present testimony, he must have related to him, before an answer is required, the circumstances of time, place, and persons present, we find it now proper to say that it is not always necessary to make such relation to the witness. If such a question be asked without reference to such circumstances, the question is proper. If, in answer to a question so put, he deny that he has made any inconsistent statements, or say that he does not remember, that ends the matter; and he cannot be impeached by production of evidence that he has done so, for the reason that a proper foundation * * * has not been laid. Section 3380, Code of Civil Procedure. Before such evidence may be introduced to contradict him, common justice and ordinary fairness demand that he have his memory aided by such relation of such circumstances, and that he be allowed to tell and explain exactly what he did say, if he said anything apparently or at all inconsistent at other times. If counsel intend to go further, and to bring in evidence of such inconsistent statements, if the witness deny them or say he does not remember, then, and only then, is it necessary to lay such a foundation."

If it be conceded that the court below erred in refusing to permit the defendant to withdraw the waiver made in the course of the proceedings above set out, it is manifest from the further record of the case that no harm resulted therefrom to the defendant; for it appears that the only inconsistent statements claimed to have been made by Bigelow were said to have been made to the witness Gardner, who testified that he talked with Bigelow in regard to the accident.

"I do not remember," said the witness, "what the substance of that conversation was. I know we were talking about this case, but I do not know what the substance of the conversation was. I do not remember what he said at that time in regard to how the accident happened. I remember talking with Dr. Brockman in regard to the accident. Q. Do you remember telling him what Bigelow told you in regard to the accident?"

The objection to that question was sustained, the defendant reserving an exception to the ruling. Later Dr. Brockman was called, and the record discloses these proceedings in regard to that witness:

"I know William Gardner. I talked with him in regard to the Ennis accident. By Col. Nolan: You want to ask this witness if Gardner didn't tell him something. By Mr. Veazey: Yes. Thereupon defendant offered in writing to prove by the witness now on the stand (Dr. Brockman) that shortly after the accident he had a conversation with the witness Gardner, in which Gardner discussed the accident and the cause thereof, and told the witness that Bigelow had told him (Gardner) that it was a piece of paper that scared the horses and caused them to run away, and not the carcass. By Col. Nolan: I object to that as incompetent and hearsay. By the Court: Objection sustained."

In our opinion the ruling was clearly right.
The judgment is affirmed.