**WIRTHLIN v. MUTUAL LIFE INS. CO.**
**No. 516.**

Circuit Court of Appeals, Tenth Circuit.
Feb. 1, 1932.

J. R. Robinson, of Provo, Utah (Robinson & Robinson, of Provo, Utah, on the brief), for appellant.

Waldemar Van Cott, of Salt Lake City, Utah (Frederick L. Allen, of New York City, and P. T. Farnsworth, B. R. Howell, and W. Q. Van Cott, all of Salt Lake City, Utah, on the brief), for appellee.

Before COTTERAL and PHILLIPS, Circuit Judges, and POLLOCK, District Judge.

COTTERAL, Circuit Judge.

The appellant, the mother of William A. Wirthlin, brought this suit as beneficiary to recover a double indemnity which, by a policy the appellee issued to him, was payable in the event he should come to his death within a year, from an injury sustained solely through external, violent, or accidental means. In her petition, she alleged his death was so caused by a gunshot wound. The answer, in addition to a general denial, alleged that the fatal shooting was his intentional act. The cause was tried to a jury. When the evidence was closed, both parties moved for a directed verdict, reserving the right if it was refused to ask further instructions. The trial court sustained the motion of the appellee and rendered a judgment in its favor. The appeal

complains of that action and the admission of certain evidence.

Objections were interposed to portions of the evidence, but generally rulings upon them were reserved, and the evidence was admitted and considered. We first notice certain material undisputed facts.

Since the early part of 1930, Wirthlin had been operating a café at Elko, Nev., assisted by his wife. He kept there, near his cash register, in a locker behind the counter, a typewriter and a .38 Smith & Wesson revolver. He was shot at his home in Elko, on the morning or forenoon of June 29, 1930. The bullet passed through the bed sheet and his underwear, entered his body above and to the left of his navel, took a course two or three inches from his heart, and emerged directly below his left shoulder blade. No witness was present. The revolver had been removed from the café and one similar to it was found at his bedside. He was apparently shot by a weapon of that caliber. That evening he was taken to a hospital and underwent an operation, remaining there until his death, on August 10, 1930. Meantime, on July 7, he substituted the plaintiff as his beneficiary in place of his wife, who was named as such in the policy.

Wirthlin's wife gave an account of relevant facts and circumstances. For some days prior to June 29, she had not slept in her husband's bedroom. She arose that morning and went directly to the café, and not finding him there assumed he had overslept; and, after typing the menus for lunch and taking breakfast, returned to the home and found him abed in his room. Asking him why he had not gone to work, he said, "My back and stomach are just killing me," and she gave him some aspirin and water. She twice furnished him a hot water bottle which he took and applied. He said nothing about being shot and she did not know it had occurred. When she saw he was very ill, she called Dr. Roantree. On his arrival, her husband asked him if he had anything for pain and asked him to get a towel from the bathroom. The doctor gave him a hypodermic injection. She went to another room at the doctor's request. He came there later, said her husband had shot himself that morning and would have to be taken to the hospital. She ran at once to his room and asked why he did that, and he said: "Well, Babe, everything looked so black; I have even blundered at this. If my folks knew it it would kill them." She said they didn't need to know it, and he replied, "Well, we will just tell them it was an acci-

dent," and she said, "All right." He said, "If I could have reached that gun I would have sure made a good job of it." She asked what gun, and he said "that gun at the café," which he had brought home "two or three days ago." He also stated it was "back of the bed somewhere." The ambulance came and she went with him to the hospital.

The witness returned shortly with the sheriff, and he asked her to get the gun. She found it on the floor on the same side where he lay. She gave the gun to the sheriff and he opened it, finding it contained five shells, and one of them had been fired. She had not seen the weapon at the café that morning. Mr. and Mrs. Vaughn, employed at the café, lived in the Wirthlin home, but had gone to work at 6 o'clock. No one else was in the house.

The witness said she and her husband had read the policy, including the suicide clause; that he had left Elko, once for three weeks, and again for three or four days; that he had mentioned taking his life, was constantly figuring up his debts, said he would end it in some way and she would "have plenty of money pretty soon." On her birthday, in March, 1930, he handed her an envelope containing a $20 bill and a note, as follows: "Dear Little girl:

"I am more nuts than cruel. But I have a little thing bothering me. Course it's hard to get through my head that I am nuts, but I think I am.

"Well, Babe, I wish you many happy returns of the day and hope you live to see 100 more, only better, happier. I am so hard to get along with anymore, I think some time I will cut it short and make it easy on all around me.

"Here's a little remembrance money you can get things you need and like. Only sorry I can't give you a million."

When she asked him why he had written the letter, he answered, "That is exactly how I feel." The day before the shooting she and her husband were on very good terms, and that night he kissed her "good night."

The witness admitted telling the sheriff she knew before the doctor came her husband had been shot and it was an accident, and she gave like testimony at the coroner's inquest, but explained the account was given pursuant to an arrangement with her husband.

Dr. Roantree corroborated her testimony. When she left the bedroom, at his request, Wirthlin said, "I have shot myself and done a

poor job of it." The doctor told him his wife would have to know about it, and if he wished other people to have a different opinion it was all right with him, and Wirthlin acquiesced. The doctor found that the shot had been fired within two or three inches from the body.

Mrs. C. C. Rogers testified she was with Mrs. Wirthlin that night at the hospital, when her husband was affectionate toward her. The next morning he stated to Mrs. Rogers that if he could have gotten the gun again he would have done a good job of it. Since the first of the year he had been despondent and was short and gruff in manner, but theretofore had been cheerful.

Mr. Clark, the district attorney, testified to two conversations with Wirthlin at the hospital. One occurred with Wirthlin alone the first or second night after he was shot. When pressed for the truth, he said he shot himself on purpose. He added, in substance, that he and his wife had had some trouble, he was heavily involved in debt and wanted to end it all, and the pistol fell out of his hand when the shot was fired. The second conversation was ten days later, when Wirthlin stated, in the presence of Paul Wirthlin and a Mr. Abershire, that on the morning he was shot he slept late, was in a doze or had a premonition there was some one in the room, he heard the shot and everything went dark and he became unconscious, and when he revived he called for help, he thought his wife was in the room but he got no response, and eventually she came to him and the doctor was called.

Paul Wirthlin, a brother of the insured, testified that at the hospital before the operation, the insured told him he was sitting up in bed, cleaning his gun, and when asked why he placed the blame on himself he answered he didn't want to leave a mess behind that might convict some one who was innocent. Fifteen days later he said he was half asleep or subconscious, felt some person was in his room, and the next thing he recalled was everything went black, he knew nothing for several hours, then called for his wife and got no response, but she finally came and provided for his wants. The witness also said Wirthlin was cheerful in disposition and never indicated he might take his life. The witness admitted he had been unfriendly toward his wife.

John Wirthlin, another brother, an employee at the café, said that on the night before the shooting the insured was not sorrowful or discouraged. The witness also said

he saw the gun at the café at 8:45 a. m. of the day the shooting occurred; that Mrs. Wirthlin came there about 10 or 10:30 that morning, took the typewriter from the locker, typed the menus, and ate a light breakfast, and he did not see her again until the middle of the afternoon, when she came back with the sheriff and told witness the insured was shot. The witness also stated that later the insured told him of the shooting, said he was half asleep, had a feeling some one was in his room, but he didn't look or pay any attention, all at once everything went black, and he didn't know anything until late in the afternoon, when he awoke and called for his wife. The witness related another conversation in which the insured said he was asleep, but he did not want to accuse anybody, because he did not know who did it and didn't want to have any trouble.

The plaintiff testified she asked her son at the hospital on August 9 how he came to be shot, and he said he did not know, he was asleep. This witness also said her son never mentioned financial trouble to her, or said he was despondent or discouraged, and he was always cheerful. The father of the insured testified his son's disposition had always been cheerful and he never mentioned financial troubles. On the night of his death witness asked him how he was shot and he said he didn't know, he was asleep.

His wife, recalled, testified her husband never told her he was cleaning his gun and was shot, nor that he was then half asleep; also that on the day of the shooting she did not go near the locker or back of the counter at the café, but that Mrs. Vaughn handed her the typewriter as she had been doing theretofore.

█ Counsel for appellant contend that the burden of proving suicide rested on the insurance company, and in any event it was a question for the jury. It is true there is a presumption against suicide, but it is one of law, and it disappears when circumstances are adduced showing how the death occurred, and in that case the beneficiary is bound to establish that the death was accidental. Frankel v. N. Y. Life Ins. Co. (C. C. A.) 51 F.(2d) 933. But the burden of proof was assumed by the appellee and was unimportant in this case. The question of an issue for the jury depended upon two considerations: First, whether plaintiff's evidence, aside from the circumstances, should have been excluded; and, second, whether the entire evidence was sufficient to present such issue.

■ Her evidence included Wirthlin's statements that the shooting occurred while he was cleaning the weapon, and that some one shot him, when he was half asleep or subconscious. Counsel for the defendant objected to the testimony when offered, as hearsay and incompetent, or after it was received moved to strike it on that ground, and excepted to the rulings admitting it. But it was inadmissible, because it was self-serving in the interest of the insured, and is subject to the general rule against hearsay evidence. Chamberlayne, Mod, L. Ev. vol. 4, § 2734; Wigmore on Ev. vol. 2, § 1457; Kling v. McCabe (C. C. A.) 36 F.(2d) 337.

■ On the other hand, there was cogent testimony that the shot was fired by Wirthlin with suicidal intent, consisting of his declarations to his wife, Dr. Roantree, District Attorney Clark, and Mrs. Rogers. All their testimony (subject to the objections to that of the wife and the doctor, which we notice later) was clearly competent because it fell within an exception to the hearsay rule, that declarations against a property interest made with knowledge of the facts by a person since deceased are admissible in evidence. Greenleaf Ev. (16th Ed.) vol. 1, §§ 147, 148; Wigmore Ev. vol. 2, §§ 1420 et seq.; Chamberlayne, Mod. Law. Ev. vol. 4, § 2769; 22 C. J. 231. And those declarations were competent evidence against the plaintiff, who had no vested title to the insurance money, as her interest therein was acquired from the insured and he never surrendered the right he had reserved to change his beneficiary. Ward v. Cochran (C. C. A.) 71 F. 127; Henderson v. Wanamaker (C. C. A.) 79 F. 736; Sheatz v. Markley (C. C. A.) 249 F. 315; Citizens' Nat. Bank v. Santa Rita Hotel Co. (C. C. A.) 22 F.(2d) 524; Hews v. Equitable Life Assur. Soc. (C. C. A.) 143 F. 850; Thomas v. Grand Lodge, 12 Wash. 500, 41 P. 882; Ogden v. Sovereign Camp, 78 Neb. 804, 111 N. W. 797; Spaulding v. Mutual Life Ins. Co., 94 Vt. 42, 109 A. 22; Truelsch v. Miller, 186 Wis. 239, 202 N. W. 352, 38 A. L. R. 914; Rosman v. Travelers' Ins. Co., 127 Md. 689, 96 A. 875, Ann. Cas. 1918C, 1047; McManus v. Peerless Cas. Co., 114 Me. 98, 95 A. 510; Callies v. Modern Woodmen, 98 Mo. App. 521, 72 S. W. 713; Court of Honor v. Dinger, 221 Ill. 176, 77 N. E. 557; Fidelity Mut. Life Ass'n v. Winn, 96 Tenn. 224, 33 S. W. 1045; Supreme Conclave Knights of Damon v. O'Connell, 107 Ga. 97, 32 S. E. 946. The decisions to the contrary are not regarded as based on sound principles.

■ Counsel for the plaintiff insist on the incompetency of the wife's testimony, by reason of section 7124, Comp. Laws Utah 1917, which bars communications between husband and wife. The statute did not disqualify her from testifying to the circumstances which throw light on the manner Wirthlin came to his death. It was designed to exclude confidential communications passing between husband and wife during marriage. In re Van Alstine's Estate, 26 Utah, 193, 72 P. 942; In re Ford's Estate, 70 Utah, 456, 261 P. 15; New York Life Ins. Co. v. Mason (C. C. A.) 272 F. 28. But the plaintiff is not entitled to invoke our decision upon the evidence, as no definite ground of objection appears to have been made to it. The record recites merely that it was admitted over plaintiff's objection. No ruling is therefore preserved for review. However, the testimony of the wife to the communications in question was quite unnecessary to the defense in this case. It was largely cumulative of other and competent evidence.

■■ The letter of Wirthlin of March 23, 1930, was very important evidence. There was the same general objection to the letter, and it is not reviewable. But another reason for admitting the letter was that it was a part of the evidence taken at the coroner's inquest, and the statutory rule of excluding communications has no reference to testimony by third persons. State v. Buffington, 20 Kan. 599, 27 Am. Rep. 193; State v. Nelson, 39 Wash. 221, 81 P. 721; People v. Hayes, 140 N. Y. 484, 35 N. E. 951, 23 L. R. A. 830, 37 Am. St. Rep. 572; Harper v. Wilson (C. C. A.) 46 F.(2d) 785.

■ The testimony of Dr. Roantree was objected to and its admission is assigned as error. We may assume the ground was they were confidential communications between physician and patient. But the objection was not well taken because Wirthlin in his application for the insurance expressly and effectively waived such objection. New York Life Ins. Co. v. Renault (D. C.) 11 F.(2d) 281; Adreveno v. Mut. Reserve Fund Life Ass'n (C. C. A.) 34 F. 870; Wigmore on Ev. vol. 2, § 2388; 54 A. L. R. 412.

The assignments of error based on the admission of the evidence relate specifically to the testimony of Dr. Roantree, the wife of the insured, and Mrs. Rogers, and require no further consideration.

■ The question remains whether the trial court erred in directing the verdict for the defendant. Three possible theories of

the case were presented: (1) Wirthlin was shot accidentally while cleaning his revolver; (2) some person came ·to his room and shot him; and (3) he shot himself intentionally.

The first was based on testimony that was incompetent, because it consisted of declarations in Wirthlin's interest. Besides, it was a most improbable account, in view of the fact that the weapon had not been emptied, and it was not shown any cleaning tools or materials were found in the room. And counsel for the plaintiff were unwilling to contend seriously for this theory to the trial court.

The second theory rested upon the circumstances, inadmissible declarations of Wirthlin that some unknown person shot him, and John Wirthlin's testimony that Mrs. Wirthlin had an opportunity to get the gun at the café, which she testified she did not do. The competent testimony tended only to inculpate Wirthlin's wife, but plaintiff's counsel took the position it was unnecessary to make that contention. The evidence against her was not sufficient to create more than suspicion. It was not of a substantial character and did not rise to the dignity of creating an issue.

The third theory was supported by the testimony of the wife of the insured, Dr. Roantree, District Attorney Clark, and Mrs. Rogers. Wirthlin repeatedly stated in substance or effect that he shot himself intentionally, and the revolver with one shell discharged lay at his bedside. There were ample circumstances to corroborate his declarations. This was the only theory that was supported by substantial evidence.

The duty of the trial court was plain in passing on the motions for a directed verdict. The plaintiff was of course entitled to have a consideration of her competent evidence and all the reasonable inferences to be drawn therefrom. But unless there was substantial evidence to show that Wirthlin was shot by another or by accident, or the evidence was such that reasonable minds would draw different conclusions from it, she was not entitled to have the case submitted to the jury. Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720; Wharton v. Ætna Life Ins. Co. (C. C. A.) 48 F.(2d) 37; New Amsterdam Cas. Co. v. Farmers' Co-op. Union (C. C. A.)· 2 F.(2d) 214; Murray Co. v. T. C. Harrill (C. C. A.) 51 F.(2d) 883. In our opinion, the evidence favorable to the plaintiff did not measure up to that requirement. The entire competent evidence was inconsistent with any reasonable hypothesis except suicide. The trial court was

required to direct a verdict for the defendant. Frankel v. N. Y. Life Ins. Co., supra.

The judgment in this case is therefore affirmed.