## YOUNG v. TRAVELERS' INS. CO.
### No. 887.

Circuit Court of Appeals, Tenth Circuit.
Dec. 26, 1933.

Philip Kates, of Tulsa, Okl., for appellant.

Richard K. Bridges, of Tulsa, Okl. (H. W. Randolph, John A. Haver, Randolph Shirk, and Randolph, Haver, Shirk & Bridges, all of Tulsa, Okl., of counsel, on the brief), for appellee.

Before LEWIS and BRATTON, Circuit Judges, and SYMES, District Judge.

LEWIS, Circuit Judge.

This action is on a policy issued by appellee to Orlando Halliburton insuring his life against loss in the sum of $7,500 resulting from bodily injuries, effected directly and independently of all other causes through accidental means. Suicide, sane or insane, is excepted from the risk. Appellant is the sister of the insured, and she was named as beneficiary. The complaint charges that insured on the afternoon of October 14, 1931, died as a result of an accidental fall from a window on the seventh floor of the Mincks Hotel in the city of Tulsa. The answer denies that insured's death was accidental, and alleges suicide. That is the only issue.

In Mutual Life Ins. Co. v. Hatten (C. C. A. 8) 17 F.(2d) 889, 890, the court, after stating that the burden was on plaintiff to show accidental death, said:

"Plaintiff, in carrying this burden of proof, is aided by the well-established presumption that death was not the result of suicide. * * *

"Where the evidence shows that insured was killed by external and violent means, there is a presumption also, when the evidence is doubtful as to whether the death was due to an accident or to suicide, that it was caused by accident. * * *

"The presumption against suicide is a rebuttable one, and is to be weighed with all other facts and circumstances in evidence, * * * and, of course, cannot prevail where such facts and circumstances show a deliberate act of self-destruction."

See, also, Frankel v. New York Life Ins. Co. (C. C. A. 10) 51 F.(2d) 933; Wirthlin v. Mutual Life Ins. Co. (C. C. A. 10) 56 F.(2d) 137, 86 A. L. R. 138.

On the first trial plaintiff recovered. The second trial resulted in a verdict for defendant. When the second trial came on it was shown by defendant that one of its witnesses who testified at the first trial resided in the state of Texas more than 200 miles from Tulsa, Oklahoma, where the case was

pending; that the witness had promised to attend the trial and defendant had sent him $100 to defray his expenses, but that he was then detained in jail in Texas charged with the commission of a felony and was, therefore, unable to be present; whereupon defendant asked the court to continue the cause until his evidence could be taken or permit the defendant to introduce the testimony of the witness given at the first trial which had been preserved in stenographic form by the court reporter. The court denied the continuance and permitted the introduction of the testimony given at the first trial by the witness. This is assigned as error.

The question has had consideration, but the adjudications are not in harmony. The Eighth Circuit in Chicago, St. P., M. & O. Ry. Co. v. Myers (C. C. A.) 80 F. 361, held that evidence so taken was admissible on second trial where the witness is beyond the reach of process and his personal attendance could not be secured. The same court in Salt Lake City v. Smith, 104 F. 457, on further consideration concluded that the statute on the subject, there reviewed, prohibited the admission of evidence so taken. This was followed by that court in Diamond Coal & Coke Co. v. Allen, 137 F. 705, and Chicago, M. & St. P. Ry. Co. v. Newsome, 174 F. 394.

The same question was ruled on in Toledo Traction Co. v. Cameron (C. C. A.) 137 F. 48, 59, by the Sixth Circuit. Judge Severens, who wrote the opinion in that case, convinces us that evidence so taken, under the facts in this case, is admissible; that the first section of the statute (R. S. § 861, U. S. Code, title 28, § 635 [28 USCA § 635]) was intended only as a broad declaration of the common law rule; and that the exceptions noted in that section by reference were additional modes for taking evidence not within the common law rule. He said:

"There is no warrant for thinking that in doing this Congress had any thought of altering the rules of evidence which obtained in such courts, or intended to exclude evidence which, without reference to the use of depositions taken under that statute, would be admissible upon the generally recognized principles of evidence. * * *

"If, therefore, the testimony which is the subject of contention in the case before us was admissible by the common-law rules of evidence, the provisions for taking depositions are not material."

He then points out the admissibility of such evidence at common law, citing thereto: 1 Greenleaf on Evidence, § 163; Wharton on Evidence, §§ 177, 178. See, also, Wigmore on Evidence (2d Ed.) § 1413, note 1; Smythe v. Inhabitants of New Providence Tp. (C. C. A. 3) 263 F. 481; Great Northern Ry. Co. v. Ennis (C. C. A. 9) 236 F. 17. Clearly the opinion of the Supreme Court in Ex parte Fisk, 113 U. S. 713, 5 S. Ct. 724, 28 L. Ed. 1117, chiefly relied on by the Eighth Circuit, dealt with a witness (a party to the cause) who resided within the jurisdiction of the court, and there was no reason why the general rule of procedure at common law declared by the statute supra should not be followed.

Appellant also excepted to a portion of the court's charge to the jury relative in part to the testimony of the absent witness wherein the court said:

"Now, there is, gentlemen, in this case some direct evidence. The testimony, and here is the way for you to consider that and the court so instructs you, the testimony of this man Graham, now he says he was across the street and he saw this man in the window and that he saw him there as if he was gazing downward, and that he saw him jump through the window. Now, you have all his evidence; it has already been transcribed by the reporter. Sometimes we have to draw our inferences as to just what the witness means by what he states. Now, further on in the examination of the witness, and I want to try to state it as near as I can the way he gave his testimony, he said he saw him coming through the window, and he made some statement about what he saw him do with his hand, but that is direct evidence, gentlemen. Now that is direct evidence that establishes this fact; that this man came through that window, that is the deceased. Now, Graham says he jumped through the window. Taking his evidence and all the other facts and all the circumstances in this case, it is for you to determine where the weight of the evidence is, whether the preponderance of it, that is the weight shows that he cast himself intentionally through the window or whether he came through the window accidentally. That is the decisive issue, gentlemen, in the case for you to determine, and you have to determine that under all the facts and all the circumstances in this case, and it is a rule of evidence, gentlemen, that although the law raises certain presumptions, and as I have heretofore instructed you, there is a presumption in law that a man does not commit suicide, but that presumption vanishes whenever there is evidence that shows that he did, and where

there is counter availing evidence as to whether he committed suicide or whether he was accidentally killed, then it becomes a question of fact for you to determine from all the evidence in the case, bearing in mind at all times that the law presumes a man won't kill himself."

In taking exception appellant's counsel said:

"I want to except to that portion of the instructions on Graham's testimony that he jumped, or ask the court to explain it by an instruction on his testimony on cross examination that he was unable to state whether he jumped or not."

To the exception and request the court responded:

"I said all the evidence was before them. I said to the jury, if his evidence established the fact that this man, it only corroborates the other evidence in this case to that extent at least, that this man came through the window, of course he said he saw him jump through the window, now that is for the jury to determine from his position and all the facts and all his other statements in the case, all his other evidence, and they can have it all, just what inference you draw from that.

"Mr. Kates (counsel for appellant): And his inference on cross examination?

"The court: They know he was cross examined."

■ There was other discussion relative to this part of the court's instructions. It is true, as the court stated, that the witness testified he saw the insured jump from a window on the seventh floor of the Mincks Hotel, in his direct examination, but the witness with equal positiveness stated more than once on cross examination that he did not see insured jump. The window of insured's room was about eighty feet above the sidewalk. Graham came up in a car and parked it across the street from the hotel. He testified he looked up at the hotel, "noticed a window open, screen up, that it was completely up. I afterwards noticed the screen was in the window but it looked as if it had been knocked out; but a man was standing in the window, a small man, and as I parked I shut the door. * * * after I shut the door I looked up to see what it was all about, and this party seemed to be sort of dazed, that is from the street impression, with a blank stare on his face looking directly down on the street; so I stood there, and as I stood there he jumped out of this window on the pavement." Later he

said on cross examination, "the screen was out." This testimony was not only self-contradictory on the question whether insured jumped but also on other material points. Immediately after the tragedy the hotel proprietor examined the room and the screen in the window was up. Graham did not testify that insured stood on the window sill. At different times he said that a man was "standing in the window," "at the window," "looking out of the window," and "came out of the window" head first, face down. The window sill was twenty-seven inches above the floor. He was asked on cross examination if the man was leaning on the window sill "like that." He answered, "Not exactly." The court asked this question of the witness, "The question he (appellant's counsel) wants you to answer is whether you saw him (make) any movement like he was jumping." He answered, "Well, your honor, I don't know whether you could determine the jump or not." When further pressed by appellant's counsel regarding the jump he answered, "I didn't notice him jump out." He was further asked, "You didn't see any movement of his except as he went through the air? A. I saw him as he went through the air." Certainly these conflicting, evasive and contradictory statements were highly important in determining what weight should be given to his testimony and in passing on his credibility. But the action of the judge on appellant's request probably impressed the jury they were immaterial. We think the omissions from the charge were highly material and should have been included with appropriate comment, or else that witness' testimony should not have been singled out at all. If the court comments on testimony it must be done with equal fairness to litigants.

■ In another respect we think there was error in the trial proceedings. We refer to the testimony of a doctor, who was called as an expert. He had specialized in nervous and mental diseases. It appears that the insured had formed the habit of over-indulgence in the use of intoxicants at irregular periods. He was a successful business man. He had accumulated considerable property. He had a family, at least a wife. For a few years before his death, he would at periods of sixty days, or less, leave his home, go to a hotel, and remain there for several days while using intoxicants to excess. On those occasions he kept in touch with his office and its business, and returned to his office and his home after his debauch was over. He had been ill and in bed at home for three or

four days on October 14. On the afternoon of that day he wanted to go downtown. His wife objected and refused to let him use the automobile for that purpose. He finally started to walk downtown. Someone passing in an automobile picked him up. He got out to see a friend on the way, a little after 3:00 o'clock. He told his friend he was going to a hotel and get a room, that he had been sick in bed and just couldn't stay there any longer. He didn't tell his friend the nature of his sickness. His friend testified insured had not been drinking that day, that he was close to him. He went from there to a hotel and cashed a check for $15.00. The young lady cashier said on cross examination that she thought he was drinking. She smelled whisky on his breath. He went from there to the Mincks Hotel. He had a small paper sack, and apparently in that was a pint bottle of whisky and a bottle of ginger ale. He registered under an assumed name, but told the hotel clerk his real name. The clerk said he stood within a foot of him, and that he didn't smell any whisky on his breath. A bellboy took him to a room on the seventh floor. The bellboy raised each of the windows in the room about a foot high. He did not know whether the screens were up or down. When they went into the room the insured was carrying a sack and a newspaper. He asked the bellboy to get him some ice quickly. When the boy returned with the ice there was a bottle of ginger ale on the dresser, a full pint of whisky, a couple of cigars and a newspaper. Insured was using the telephone talking with Mr. Holmes at his office. He asked the bellboy to pour him a big drink, which he did. He poured a water glass half full of whisky. A few minutes after the bellboy returned to the office he heard a noise outside, went out on the sidewalk, and insured was lying there. He was unconscious. He died soon after being taken to the hospital.

The expert witness, who had specialized in neurology, was asked this question:

"You have heard from the witness stand that Mr. Halliburton was a nervous man; that he worked under high tension; you have heard that in the last year or two of his life, sometimes every thirty days, sometimes every sixty days, he had periods of drinking; you have heard that when he was being nursed for those periodical drinking spells that it sometimes became necessary for him to have a physician or nurse with him; that when he was drinking Mr. Halliburton was remorseful and regretful. Basing your opinion, doctor, on the statements I have just made, and from the witnesses in this case, state whether or not in your opinion persons who are periodical drinkers, is there at the time they are drinking any certain or fixed mental attitude or characteristic present in those types of persons."

It will be observed that the question was based in part on what the witness had heard as testified to by others. He sat by during the trial and heard the evidence. Over objection he was permitted to answer the question. He answered:

"The story, as I heard it from the witness stand, with respect to Mr. Halliburton at once labels him as a typical case of periodic dipsomania * * * these people always include, either in their mind, and usually directly expressed, a suicidal tendency. * * * they are all potential suicides.

"Q. Is there any exception to that rule?

"A. None whatever. That is 100% of the dipsomania.

"Every periodical drinker, as defined, is a potential suicide."

On cross examination it appeared that the witness had assumed that while the insured was sick at home for three or four days he was at that time on a drinking spell and was continuing it after he got to the hotel. When his attention was called to the fact that there was no evidence that he was drinking while at home and that the witness was assuming that he was on such a spell, he answered:

"I am assuming the interpretation of the stories I have heard here in respect to that day. * * *

"Q. Now, at that time, the afternoon of October 14th, what fact has been testified to on the witness stand that justifies you in assuming that he was getting out of the debauch, what fact?

"A. That he had been home for two or three days; no explanation of that sickness otherwise.

"Q. Was there any statement that he was drunk during that period?

"A. No. * * *

"Q. How can you assume he was in a debauch when there is no evidence except he was sick?

"A. I am assuming that he was in the depressed phase of a dipsomania episode.

"Q. What is the evidence he was in that state on October 14?

"A. The fact he was found on the sidewalk."

The afternoon of October 14th was very warm. The hotel room to which Halliburton was taken was closed, and the bellboy testified it was hot. There was testimony that immediately after insured was found on the sidewalk an ambulance came for his body, and the one in charge of the ambulance smelled his breath for the purpose of ascertaining whether or not he was drinking. He testified that he couldn't detect whisky. It had also been testified by a doctor called by plaintiff that insured, if he took a large drink of whisky at the time and under the circumstances stated in the testimony, he would probably vomit. If that occurred soon after taking the drink, whisky could not be detected on his breath. When he was taken into the hospital an interne made a like examination, and testified that he could not discover whisky on insured's breath. Those facts and that testimony were called to the attention of defendant's expert, especially that it appeared that insured took a large drink in a warm room and might have become nauseated, and he was asked:

"Q. Wouldn't he go to the window for air?

"A. Yes, sir, but he wouldn't raise the screen. Not one person in one million would go to a window with a screen in it and raise the screen.

"Q. Do you know that the screen was closed when he went into the room?

"A. I don't know anything about it.

"Q. Has there been any evidence in this case, was there any evidence that he raised the screen?

"A. I don't recall.

"Q. And yet you are willing to assume that and put it in your answer, although there has been no evidence here, for the purpose of making a favorable—

"A. I accept my conduct, if you please."

There is no testimony whatever as to the condition of the screen when insured was taken to the room by the bellboy. He testified that he did not know whether the screens in the windows were up or down.

It thus appears that the defendant's expert based his opinion, in part at least, on facts that were not proven, on assumptions of his own. Moreover, we think it can be said as a matter of common knowledge that all periodical drinkers (100%) do not intend when in that condition to commit suicide. Not only did this witness assume facts that were not proven, but he admitted that he put his own construction on those that

were proven. This case demonstrates the propriety and necessity of confining an expert witness to a framed interrogatory that embodies only facts that have been testified to. It seems to us that it was the clear duty of the court to restrain this witness.

Reversed and remanded for a new trial.