## In re FORD'S ESTATE.

No. 4538.   Decided November 1, 1927.   (261 P. 15.)

*Hurd & Hurd,* of Salt Lake City, for appellant.

*Fisher Harris* and *Walton & Nelson,* all of Salt Lake City, for respondents.

THURMAN, C. J.

This is a contest over the will of William Hersey Ford, who died in the state of Oregon, February 12, 1926. At the time of his death he was a resident of Salt Lake City, Salt Lake county, Utah, and left an estate therein consisting of real and personal property. His heirs and next of kin were Mary Nowlin Ford, his surviving wife, Arthur P. Ford,

his son by a former wife, and Beulah F. Ford, an adopted daughter, all of whom reside in Salt Lake City.

By a purported last will and testament executed April 14, 1924, he left all of his property, both real and personal, to his wife, Mary Nowlin Ford, except the sum of $1 each to the children above named. His wife is named in the will as executrix, and it is expressly provided in the will that no bonds or security of any nature should be required of her as such executrix. She filed the will for probate in the district court of Salt Lake county, February 20, 1926.

On April 8, 1926, Arthur P. Ford and Beulah F. Ford, above-mentioned heirs, filed their amended opposition to the probate of the will on the grounds that the purported will was not the will of the deceased; that at the time of its alleged execution deceased was not of sound and disposing mind, but on the contrary, was insane and had no power to make a will. As a further ground why the probate of said purported will should be refused and denied, contestants allege:

"That at the time of the alleged execution of said purported will said decedent was prejudiced against these contestants and each of them, and was laboring under insane delusions as to them and each of them, and was not acting freely or voluntarily, but was under undue influence of Mary Nowlin Ford, the petitioner herein, and the alleged subscription, publication, and execution af said purported will was procured by fraud, circumvention, undue influence, menace, coercion, and duress practiced and exercised upon said decedent by said petitioner, in part as follows, to wit, that said decedent had an uncontrollable desire and mania for sexual excesses and perversions, including fellatio and cunnilingus, and was susceptible of being dominated and enslaved by a woman who would submit to his proposals and gratify such appetites, and contestants are informed and believe and therefore allege that the said petitioner became aware of these facts and formed a scheme and design to profit thereby and ultimately to acquire his estate, and for many years consorted with the decedent in a state of adultery and sexual perversions and perverted sexual relations including those above mentioned, and thereby attracted him away from his children, these contestants, and his wife, and turned him against them so that his wife was driven to divorce him and said petitioner went through a marriage ceremony

or ceremonies with said decedent, but said excesses and perversions continued until his death, and the petitioner was thereby enabled to and did at all times dominate, enslave, debilitate, and control him, both mentally and physically, and as a part of said scheme and design she stated to the decedent, who believed her, that these contestants were guilty of ill treatment of petitioner and of decedent and were wanting in affection for him, caring only for his money, and she thereby managed to stifle and destroy his natural feeling for these contestants and to substitute therefor a feeling of ill will and resentment, and that said petitioner also stated falsely to said decedent, who believed her, that if he would give her his property by will she intended to and would properly provide for his wife and children therefrom, and that it was better for them that such power be given her and his property thus disposed of."

Contestants pray that the probate of the will be denied and for such other and further relief as they may be entitled to.

The jury to whom the case was tried rendered a general verdict to the effect that the document proposed was not the will of the deceased, William Hersey Ford, and a special verdict to the effect that the deceased at the time of executing the will was not of sound and disposing mind and memory; that the document in question was not his voluntary act; that it was procured by undue influence of the proponent; and that the deceased was not in such mental state when he executed the document as to be able to know and understand its contenst. Thereupon, before the jury was discharged, plaintiff moved the court for a verdict in favor of the plaintiff notwithstanding the verdict of the jury, on the grounds that the answers to the special interrogatories were inconsistent with the verdict as the jury by its answers found that the deceased was not of sound mind, and also found he was subject to undue influence. The further ground was alleged by plaintiff that the evidence was insufficient to support the verdict.

Judgment was entered on both the general and special verdicts in favor of contestants, and probate of the will was denied.

Plaintiff filed a motion for a new trial. The motion was overruled, and she appeals to this court for a reversal of the judgment. Plaintiff assigns numerous errors, the most important of which is that the evidence is insufficient to support the verdict.

This is an action at law. (*Miller* v. *Livingstone*, 31 Utah 415, 88 P. 338.) If there is any substantial evidence to support the verdict, this assignment of error is not sustained.

The purported will was offered in evidence by the proponent and its execution proved by the subscribing witnesses, J. H. Hurd and J. D. Hurd, of the law firm of Hurd & Hurd, of Salt Lake City, who also prepared the will. The testimony of these witnesses prima facie established the authenticity of the will and the formalities thereof in all respects required by the statute. Each of them testified that he regarded the testator as perfectly sane when he executed the document. Both of them had known the testator for several years, and J. H. Hurd, the senior member of the firm, had been the testator's attorney in previous litigation. They testified that his wife, Mary Nowlin Ford, came into their office about ten days before the will was prepared and informed them that the testator desired to make some changes in a former will. When the testator afterwards appeared, he dictated the terms of the will and the changes he desired to make. The changes were merely formal and unsubstantial. Instead of leaving all of his property to his wife Mary Nowlin Ford, and expressly excluding his son, Arthur, and his daughter, Beulah, from participating in its provisions as provided in the former will, he directed that each of them be given the sum of $1. That was the only change. The former will was executed in 1922.

The testator will hereinafter be referred to as the deceased, proponent will be referred to as plaintiff, and contestants will be referred to as defendants.

Plaintiff having established a prima facie case for the probate of the will, evidence was introduced by defendants

in opposition thereto. Much of the evidence introduced by them in support of the charges made in their pleadings is of such a nature that it is unfit for publication, even in a judicial opinion. The terms "fellatio" and "cunnilingus," employed by defendants in describing the conduct of deceased, represent the lowest and most debasing forms of sexual perversion. It is unnecessary to give the Anglo-Saxon meaning of these terms. It was unavoidable in the trial of the case that the jury should have the plain facts laid before them, but it is unnecessary to repeat such testimony here in order to determine the issues involved.

The record shows that deceased was 57 years of age at the time of his death. He was a large man, six feet and four inches in height, and weighed 350 pounds. His former wife, Frances C. Ford, was 56 years of age when the case was tried. They were married in 1887 and had one son, Arthur, and Beulah, an adopted daughter. Arther was 29 years of age, and Beulah 32. She was unmarried. Arthur was married in 1916 and has three children. Prior to 1917, the record shows, the family lived together, and deceased manifested love and affection for his children. There had been some estrangement at times between deceased and his wife, Frances, especially in 1913 when they separated in San Diego, Cal. There is evidence to the effect that she left him on account of his undue attention to some other woman. The separation between deceased and his wife continued for a period of about six months, when at his solicitation she resumed cohabitation. In 1917 he became acquainted with Mary Nowlin, who afterwards became his wife and is plaintiff in the present proceeding. She first became acquainted with deceased by leaving her car for storage in the Yellowstone Park garage, in Salt Lake City, with which business deceased was connected. She did some business with deceased in the purchase of a car and also some automobile fire insurance business for a company by which she was employed. She afterwards became associated with deceased as a stockholder, secretary, and treasurer of the Ford Truck-

ing Company, of which deceased was the head. The record is replete with evidence to the effect that during the period from 1917 to 1921, when Mrs. Frances C. Ford was divorced from deceased, the deceased and Mary Nowlin were unduly intimate. He made no secret of his relations with her, either among his family at his home or among several of his friends and associates. His wife Frances, his son, Arthur, and his daughter, Beulah, testified to his manner of speech and conduct in this regard.. They testified to telephone communications between her and deceased in which he would call her up and propound questions to her of a vulgar nature, indicating that he had had relations with her of the nature charged in defendants' pleading. He boasted to his family of his amorous relations with Mary Nowlin and told them she had given him the greatest pleasure of his life. He showed vulgar pictures to his son and others, wherein men and women were exhibited in compromising positions. Among others, he showed a picture to his son in which both forms of sexual perversation, as charged by the defendants in their pleading, were being practiced by a man and a woman at the same time. He told his son in the presence of others, referring to the picture, that that was the way he did it with the "Kid" (a name by which he frequently referred to Mary Nowlin). Deceased and his wife frequently quarreled over and concerning her. He indignantly resented any sarcastic or bitter allusion to her by any member of his family. He always took her part. He and his wife not only quarreled, as before stated, but he frequently struck her or slapped her, and at the same time cursed her and threatened her life. Arthur sometimes interposed in defense of his mother and upbraided his father for his course of conduct. His children testified that he had a strong will, and that his will was law in the family. They testified to observing deceased on different occasions with his arm around Mary Nowlin, and, on one occasion, that she was sitting on his lap with deceased's hand apparently where it ought not to have been.

It is impracticable, without extending our conclusions from the evidence to an unreasonable length, to enumerate all of the instances tending to show the conduct of deceased in his relations with Mary Nowlin and his conduct towards. his wife and children. The evidence shows that in recent years he became more irritable and his temper more violent towards members of his family and others. The result was that his wife left him in 1921 and procured a divorce.

F. L. Clawson, for defendants, testified that he had known deceased and his wife, Frances, for about 35 years and had been more or less intimate with deceased and his. family. When he first knew them, they got along nicely. Deceased introduced him to Mary Nowlin at the Yellowstone Park garage. Deceased "was quite familiar in handling her." Deceased, in conversation, called her "the Kid." He called her over the telephone when witness was present. The conversation, as stated by the witness, indicated that the two had indulged in sexual perversion, as charged by defendants. Witness was present when deceased exhibited the picture referred to by Arthur and heard him tell Arthur he did not know what a good time was until he practiced that sort of thing, or words to that effect. Witness also testified to seeing deceased indulge in fits of temper in deceased's home and seeing him shove the table away from him and spill the food on the slightest provocation. He had been present when deceased and his wife, Frances, quarreled when the name of Mary Nowlin was mentioned. Deceased usually said to his wife it was none of her business. Witness had heard him say what a wonderful head Miss Nowlin had for business; that she was a help to him in his business; and that it was no concern of his wife. Deceased's temper was easily aroused in recent years. He would rave like a crazy man, and, in witness' estimation, it almost amounted to insanity. Deceased was always going to get his gun, which he called "old Betsy, and blow somebody's guts out, or somebody's head off." Witness said deceased seemed to have an "idea of sexual things on his mind" the greater part of

the time. Deceased was paymaster in the telephone company's office for two or three years when witness was employed there.

Ray N. Dundas, for defendant, testified he lived in Salt Lake City, was working for the International Harvester Company, and knew deceased in his lifetime through business connections affiliated with the trucking business; that in 1922 he was in a crowd of men who were conversing, probably in a jocular manner, about "Ford's woman"; that he understood it meant Miss Nowlin. Deceased, in effect, stated she had given him the best time he had ever had in his life. What deceased said, as described by the witness, amounted to an admission that he had indulged in the practice of "fellatio" with the woman in question. Witness also mentioned an incident indicative of the violent temper of deceased, and also an incident in which he referred to his wife, Frances, as a "G—— d—— slut."

W. F. Reed, for defendants, was associated with deceased in the Yellowstone Park garage. Witness saw Miss Nowlin first in 1917. She used to stop and talk with him and the deceased. Deceased treated her very courteously in witness' presence. Their business was good at that time. Deceased would take the money away every night. Witness saw him go away on occasions with Miss Nowlin, when he had the money. Witness had driven them around the city and had deposited them on the street near the Barth rooming house. Witness had heard deceased call Mary Nowlin over the telephone. He just carried on a general conversation. Deceased would sometimes call her "dearie," and sometimes "my little girl." He never carried on rough conversation over the telephone. His language was always respectable. Witness had heard deceased talk to his wife about Miss Nowlin at his home and at the garage. Deceased would not stand for Mrs. Ford to say anything about Miss Nowlin. He would curse her and tell her to mind her own business. Witness had heard him tell his wife that Miss Nowlin was worth a dozen of her, and that he was going

to marry her. Speaking of his business relations with deceased, witness said they kept track of the money by checking their oil and gas tanks. When the money was checked, it was put in the bank. He had difficulty in getting an accounting with deceased, but they had no litigation over it. They sold out the business for $6,500. Deceased got it all, but finally settled with him by giving him an equity in a place on Thirteenth South street, Salt Lake City. They had no agreement with Miss Nowlin whereby she was paid weekly installments. Deceased might have had an agreement with her.

Mrs. Mary Ewer Earl, for defendants, testified that she was floor lady at the National Cleaners & Dyers, Salt Lake City, knew the deceased, and knew that Miss Nowlin lived around the corner from witness' residence. She had seen deceased and Mary Nowlin stand too close together to be "just talking" both at the garage and over at Miss Nowlin's home. Witness and her husband went over one night to Miss Nowlin's. They were going to rent it, and they were to take care of Miss Nowlin's mother for the rent. Deceased was there. This was before deceased and Miss Nowlin married. They were in the front room. Deceased had his coat off and his suspenders were off his shoulders. "They were not married; but they were figuring on it." It was after deceased and his wife were divorced.

Dr. William S. Beer, for defendants, testified that he was 60 years of age, resident of Salt Lake City, physician and surgeon, and graduate of Columbia Medical school. Had practiced his profession for 30 years and had had a number of psychopathic cases, which means a degenerate condition of the mind relative to coitus. He had had occasion to observe and study the susceptibility of sexual perverts to be influenced or dominated by persons who will submit to their desires. He knew deceased in his lifetime for 30 years or more, and was acquainted with his family. He last treated deceased professionally in 1910; had seen him since, and had talked with him. Deceased alluded to sexual matters in

those conversations. From the conversations, witness concluded deceased was sexually perverted. All witness knew was what deceased told him. Deceased had a desire for a woman to satisfy his passions by means of "fellatio." Witness tried to explain to deceased, so he would comprehend the real danger of a habit of that kind, how it would affect him mentally, and the influence the person that practiced it with him would have over him. He told deceased if he did not cease the habit he would become a mental degenerate and might lose his mind entirely; that he would be under a sort of hypnotic influence and be subject to the woman's beck and call, and would have to grant everything she wanted of him. They had a conversation in 1917. Witness was not his physician at that time. Deceased had an injury to his private parts. He came into witness' office and showed him the injury. Deceased said he had been bitten; "that the d——d kid had bitten him." He had a conversation with deceased (1925) in which deceased again referred to his habit. Witness again told him he would have to quit it, or he would become a regular degenerate; that deceased could not talk 15 minutes without diverting to that subject; that he did not seem much different from what he was in former years; that he seemed to have a mania for talking on that subject. Witness stated that persons afflicted in this manner seem to be under the hypnotic influence of the person with whom the act is practiced. The last time witness talked to deceased he seemed to be worried about something; that he did not show the vigor, spirit, and ambition he usually showed. He said he thought he would have to go away for his health. Witness told him it would not do him any good unless he changed his tactics and got away from this perversion; that deceased still had it and discussed it at the time. When asked his opinion as to whether deceased, during the last 2 or 3 years of his life, was of sound mind, he answered that he could not say as to that. When asked his opinion as to whether deceased was under the influence of some one he answered that it was his idea that

deceased was influenced by something. Witness said he had seen a great deal of sexual perversion during the late war. In 1910 witness was at deceased's home on Eleventh East street. Mrs. Ford had a black eye. In answer to witness' inquiry she showed him her leg, which was all bruised. She said she had fallen down the steps. Witness told her it was a wonder she did not break her neck and advised her to be more careful. He said the same thing to deceased when he went into his room. Deceased said, "Hell, she didn't fall down stairs at all." He then stated, in effect, that she had refused to indulge in his habit of sexual perversion, and he had slapped her in the eye and kicked her out of bed. Deceased first mentioned this perversion to witness in 1893. Witness knew the deceased to be a good business man. He was able to compete with others in business. Many people in the world who are sexual perverts are very successful in business and are never suspected of sexual perversion and are approximately normal in every respect. Witness disclaimed saying deceased was insane, but said he was insane upon that one subject. So far as witness' knowledge went, deceased upon any other subject was perfectly sane.

John J. McGetrick, for defendants, testified he lived in Salt Lake City, knew deceased in his lifetime, and was associated with him in the trucking business in 1920 when they incorporated the "W. H. Ford Trucking Company." He and deceased and Mary Nowlin went to Finch's cafe. Deceased invited witness to dinner. They were the only persons in the booth. After dinner Mary Nowlin started to put her wraps on and witness picked up the slips and deceased sat down on the table. Deceased and Mary Nowlin got close together and he was putting his hand under her dress. Witness took the ticket and went out. The others remained in the booth a couple of minutes, possibly three or four. Deceased bought witness' interest in the business three or four months after the organization. Witness was dissatisfied with the business. He stated they were all ar-

rested because the license was not right. They all got back the money they had paid in. Miss Nowlin was secretary and treasurer of the company. Witness did not get a chance to look at the books, "and that was the reason the company busted up." Witness thought they were operating legally. Deceased said all the licenses were paid in his property tax, but they were not. Witness and deceased were never on friendly terms after that.

At this point defendants rested their case, and plaintiff moved for a directed verdict against them on the ground that the evidence was insufficient to support a verdict, The motion was denied, and plaintiff excepted.

In the foregoing statement we have stated the prominent features of the evidence only, and in some instances we have merely drawn conclusions. From what has been stated, we feel warranted in holding that there was substantial evidence introduced by defendants to establish their charge of sexual perversion on the part of deceased of the kind and nature charged in their pleading, and that, too, with Mary Nowlin who afterwards became the wife of deceased. There is also evidence to show that a man who practices that form of sexual perversion, especially "fellatio," as defined by the physicians, is susceptible to the domination of the person who participates with him in the practice. There is the opinion of the physician, who testified for the defendants and who was personally acquainted with the deceased and his sexual perversions, that upon that subject deceased was insane. The same witness, however, disclaimed saying that deceased was insane as to other subjects. In fact, the witness expressly admitted deceased was a good business man, and that there were many sexual perverts who were very successful in business and able to compete in business with others.

If we were reasonably satisfied that the evidence thus far was sufficient to show that deceased was of unsound mind, to the extent that he was wanting in testamentary capacity when he made the will or was acting under the

undue influence of Mary Nowlin Ford, as the term "undue influence" is defined in the law, it would be unnecessary to further consider the evidence in disposing of this assignment of error, for, as before stated, if there is any substantial evidence to support the verdict, this assignment is not sustained. In view of the extraordinary features of the case, and passing for the present the motion for a directed verdict, we have concluded to state the substance of the evidence on the part of the plaintiff and deduce our final conclusions from the whole evidence. Evidence conflicting with that produced by defendants will not be considered in reaching our conclusions.

Noble G. Peterson, for plaintiff, testified he lived in Salt Lake City, was manager of the Power Plus Oil & Gasoline Company, knew deceased in his lifetime, had business dealings with him in the last $3\frac{1}{2}$ years, had sold him practically all his oil and gas requirements which ran into a considerable volume of business. Witness had had conversations with deceased during the course of his business dealings with him and had formed an opinion as to his mental condition and mental capacity. He thought deceased was far above the average in intelligence; that he had a rough exterior, but was a brilliant man; that he was highly educated and was one of the most strong-willed men he had ever met. Witness had never observed anything to indicate that deceased was of unsound mind, and had never observed anything in the way of delusions or hallucinations. He stated that deceased was a man of good business judgment and would deliberate on business before venturing into it. He had heard deceased speak of his present wife, Mary Nowlin Ford—how hard she worked; that she was working herself to death cooking and doing housework, and was also his chauffeur, secretary and bookkeeper, and that nobody could excel her on real estate transactions, as she had received her training in a real estate office. Deceased told witness when he married her he was on the rocks financially; that if he had married her 10 years earlier he would

have been worth a million dollars. Witness had been in the home of deceased and Mary Nowlin Ford and they seemed very happy. Witness did not observe any domination by her of deceased. He observed that deceased's word was law; that when he said anything it was done. He had had several conversations with deceased about his son, Arthur. On one occasion deceased said he was working too hard, and said "It was too bad his son couldn't take the load off his shoulders;" that if he was the right kind of a man he could act as foreman for deceased, but that for some reason or other he was a regular I. W. W.; that he got his son a job; and that he went on a railroad strike and seemed to think the world owed him a living. Deceased said if it were not for his wife, he would not have anything, and that she was entitled to everything he had; that he had had a settlement with his first wife when they separated and had continued to give her money from time to time "until she raised so much fuss that he discontinued the allowance." Deceased said he had made a will, but that there was some technicality in it, and he had had his lawyers make a new one. Witness said that neither he nor his wife was related to deceased or Mary Nowlin Ford.

Mrs. Edith Nowlin, for plaintiff, testified that she was the wife of Bailey B. Nowlin brother of Mary Nowlin Ford, and lived in Salt Lake county, just outside of the city; knew deceased and Mary Nowlin Ford; met deceased 7 or 8 years ago. She had a car for repair in the garage of deceased. She conversed with deceased in the winter of 1924 when he went to Hot Lake, Or., about the disposition of his property. He said he wanted to fix things up; that his health was not very good, and he wanted to leave things so Mrs. Ford would be perfectly safe. He said he was making a will on the advice of some eastern attorney he met at the sanatarium at Hot Lake, Or. He said Mrs. Ford had been of great assistance to him, and if it had not been for her he would not have anything. He said he wanted it fixed so she would have no trouble in case of his death; that on

the advice of the attorneys he was leaving her everything. He spoke of having made a former will. The attorneys told him that he would have to leave his son and Beulah something in order to make it legal. Deceased said his son had treated him badly and had no regard for the advice he had given him; that he had educated him and tried to make something of him, but that he would not listen to him. Deceased said Mary Nowlin had put money into his business—had mortgaged her home to pay his mortgage off on his place when it was about to be sold. Witness said deceased was a plain spoken man; that he did not beat around the bush.

Elder Hood Houston, for plaintiff, testified that he had resided in Salt Lake City since 1919, and was salesman in the White Automobile & Truck Company; knew deceased; first met him in 1920; and had seen him occasionally since then. Witness considered deceased a conservative business man; a hard man to persuade, and would thoroughly investigate everything before he went into it. Witness never saw anything that would indicate to his mind that deceased was insane, or subject to insane delusions or hallucinations; that there was nothing in his conduct that would even suggest he was insane. Witness did not think deceased would be dominated by the will of any person. He considered him a man of good judgment in business. He had no social acquaintance with deceased or his family. His business acquaintance with him was as agent for the White Automobile & Truck Company. Witness knew that Mrs. Mary Nowlin Ford kept the books of deceased's company and issued the checks; that she appeared to look after the details of deceased's business; that she would issue checks to witness or his company.

J. D. Hurd, recalled for plaintiff, testified that in October, 1925, he had a conversation with deceased, in which he expressed a desire to get rid of the trucking business and convert what he had into money and invest it in real estate

mortgages, because his wife understood that business and he was not afraid of anybody doing her out of the money if it was so invested; that he did not feel she could handle the trucking business; that deceased spoke of the will he had made, and said he did not want his two children to have anything as they had "pulled his leg all his life," and they were not entitled to anything. Witness had known deceased for many years, had dealings with him, and would say he was perfectly sane and displayed good judgment in business; that he seemed to know exactly what he wanted and how to get it.

Henry T. McEwan, for plaintiff, testified that he resided in Salt Lake City, was cashier of the Utah State National Bank, and also its vice president. He knew the deceased. He had done business with the bank. First knew him in 1918 when deceased was connected with the Yellowstone Park garage. After that deceased organized the W. H. Ford Trucking Company. The company opened an account with the bank in 1920. Witness had occasion to observe deceased in his business affairs with the bank and never had any idea he was insane; that deceased lost money in the garage business, but seemed to be making headway in the trucking business. From his observation he thought deceased was a man who had a strong will of his own. Witness never had any thought that deceased was under the domination of any one. He saw nothing to indicate that Mary Nowlin Ford was dominating him, or that he was under her control mentally. Deceased had told witness, in substance, that his success in the trucking business was due to the assistance she had given him, and that his partnership affairs in the garage business had not been satisfactory. He blamed the failure of that business to his partners.

Clifford M. Alston, for plaintiff, testified he was a bishop and also a general contractor, and had resided in Salt Lake City since he was a child. He knew deceased 4 or 5 years prior to his death. He had done a large business with deceased during the last 2 or 3 years, in the sand and gravel

business. Deceased always appeared to be mentally and physically strong. There was nothing to indicate that he would be easily dominated or led to do what he did not want to do. He seemed to be very positive. He had no patience with any employee who did not do as he was instructed. Witness first met Mary Nowlin in Tennessee, when he was on a mission there, and had known her ever since. In conducting deceased's business she looked after the clerical part—took orders and gave prices. It was a hobby with deceased to speak of his wife and how well she took care of his business and how much he depended on her. Deceased was not a man of weak and vacillating character. Witness never observed anything to indicate that deceased was insane or suffering from insane delusions. Witness was a frequent visitor at the home of Miss Nowlin and her mother, and became acquainted with deceased through Miss Nowlin who solicited his business for deceased. Mary Nowlin Ford was not one of his converts and he had nothing to do with bringing her to Utah, but she was a member of his church.

Eugene Kahn, for plaintiff, testified that he lived in Salt Lake City, and knew the deceased; that deceased lived in the first house north of witness on Eleventh East street. Witness' business was that of a wholesale grocer. He had occasion to talk with deceased on many occasions, that they were friendly and neighborly. Deceased did not appear to be insane in any particular. His mentality was above the average. Witness had conversed with him many times concerning his domestic affairs and particularly about his son, Arthur. Deceased said he would like to have Arthur associated with him in business; that he thought it would be to the advantage of both of them, but that it didn't seem that they were able to get together. These conversations concerning Arthur occurred a year or two years ago. The substance of the conversations was that he would like to have Arthur associated with him, but that he had declined. Witness never saw anything in deceased other than normal.

Frank E. Burrows, for plaintiff, testified that he was connected with the Salt Lake Sand & Gravel Company and had lived in Salt Lake City off and on for 15 years; had known deceased for about five years prior to his death. Their acquaintance was a business one. Deceased was operating a fleet of trucks. He was working for witness' company. From his conversations with the deceased, he thought he was a man of very good judgment; that his mentality was at least equal to the average, if not above it. Witness never saw anything that would indicate that deceased was insane or was subject to delusions of any kind. The last time he saw the deceased was a night or two before he went to Hot Lake, Or. Witness and Mr. Carlquist were requested to go up there on some business. At the time deceased's mental condition was as keen and alert as it always had been. He was sick physically, but was able to transact business. He said he was going away for his health. Witness noticed no difference in his mentality in December, 1925, from what it had been. He considered deceased especially strong of will and dominant in mind, and did not think he would be dominated or controlled by another. Witness did not think that deceased discussed sexual matters with him at any time. Mr. Carlquist, who went with him, was president of witness' company. Deceased referred to his wife who handled the inside business of the office and said how competent she was and how careful, and witness found that to be true. Her accounts were always exact, and she was was always pleasant to do business with. Deceased spoke many times of his reliance upon her.

C. H. Carlquist, for plaintiff, testified he was a real estate broker in Salt Lake City. At present was with the Ashton-Jenkins Company, and also with the Salt Lake Sand & Gravel Comany. He had resided in Salt Lake City all his life, and knew deceased personally for the last 2 or 3 years. He commenced doing business with deceased in October, 1924, and had several transactions with him up to the time of his death. He visited his home the night before

he went to Oregon and conversed with him; that was ten days or two weeks before his death. Mr. Frank Burrows was also present. Deceased had some contract for the delivery of sand and gravel from witnesss' company and wanted to have assurance that while he was away things would run along and prices could be depended upon. Witness assured deceased he would be treated right and his business be taken care of. Witness asked him if he was leaving things in the shape he wanted them, as "you can never tell what might happen." Deceased said, "I have everything in just the shape I want them." He did not tell witness, in detail, what arrangements he had made, but said he was taking care of his wife because she had been the means of straightening him out financially. He referred to her as his bookkeeper and keeping things straight. He said that until she took hold of the finances and the accounts he had had a hard time, but that now he knew exactly where he was at any time. He regarded the fact that they were doing business together as the means of putting him on his feet financially. He said it was her money that purchased the trucks in the first place. Witness regarded deceased as above the average in intelligence. There was nothing in his actions or conduct that would indicate he could be easily controlled or dominated. If he took a position, it was difficult to persuade him to the contrary. The only opportunity witness ever had of observing deceased's home relations was on the evening referred to, and he and his wife seemed to have a high regard for each other.

Harold LaFount, for plaintiff, testified that he resided in Salt Lake City and was manager of an irrigation project and receiver of the Sevier River Land & Water Company. Knew deceased in 1921 and 1922 quite intimately, and from that time until his death. He found deceased to be a man of good judgment and sound mind. He was a man of strong mind, and very firm. During the years mentioned witness was in the gravel business and deceased did the hauling. Witness saw him two or three times a month just

prior to his death; had an opportunity to observe his mental condition; and did not observe any signs of insanity. From all witnes saw of deceased he thought he was absolutely sane and had no delusions. The only thing witness remembered deceased saying about his wife, Mary Nowlin Ford, was that he was ambitious to convert the holdings he had into real estate mortgages, because, he said, she could handle that as well as any one on earth. He said she had been a "brick" and had been of big help.

Mrs. Mary Nowlin Ford, plaintiff, testified at great length in her own behalf. It is impracticable to state even the substance of her testimony. Much of it is in conflict with the evidence on the part of the defendants. She categorically denied any form of sexual relations with deceased prior to their marriage and every incident testified to by defendants' witnesses suggestive of improper relations between her and deceased. Her testimony, however, in this regard, cannot be considered by the court in determining the sufficiency of the evidence to sustain the verdict. She stated she came to Salt Lake City from Tennessee in 1902 with her father and mother. Her father died in 1914 and she continued to live with her mother at 541 South Third East street until 1922, when she married the deceased. She first met deceased in 1917 when she stored a car with him for repair. Shortly afterwards she sold him the car, the purchase price payable weekly. She called at his office in the Yellowstone Park garage for payments. She did not remember any business of moment with deceased during 1918. She lived in the neighborhood of the garage and went that way to and from her work for E. B. Wicks & Co., a real estate company. In that employment she became familiar with abstracts of record and real estate titles, in a general way. In 1918 she was requested to draw a deed from the deceased and Mr. Reed to Arthur Ford. She attended to the transfer and did the notarial work. She made a loan to Arthur of $200 to assist him in acquiring title to the lots. She also made loans to the deceased. She had been working and had a little

savings. The loans she made to deceased were made either at the garage or at her home—mostly at the garage. She paid $500 on the first truck he bought. It was intended as a loan at that time. In 1919 she was requested to endeavor to find a customer for the garage business. She had a meeting with deceased and Mr. Reed. They had a list of their liabilities and seemed to think they were running behind. In 1919 she made loans to deceased, or to the partnership. Usually they were small loans, $40, $60, or $100. She testified that she had checks for most of them. The W. H. Ford Trucking Company was organized in February, 1920. She was one of the incorporators and subscribed for 25 shares. Deceased subscribed for 40 shares, and Beulah Ford for 4. Witness paid in her $2,500. Deceased's subscription was paid for partly in cash, and the balance in an equity in the garage. That also covered Beulah's subscription. Witness was secretary and treasurer of the company. She took care of her part of the business at her home, as she was still employed by E. B. Wicks & Co. The service rendered the trucking company was in the evening, after office hours. Deceased kept the time on the job and turned it over to her, or phoned it to her, and she "checked with him Friday evening, at which time he got the checks for the men." The first time she was at deceased's home at 29 South Eleventh East street she accompanied a man she introduced to deceased in connection with securing a loan for the trucking company. Nobody was home but the deceased. She was also at deceased's house when he was sick in April, 1921. This visit was in connection with a claim for compensation insurance. She went to get the data on the claim. A few days later she went to take a check for the insurance company, on these claims. Mrs. Ford and Arthur were there. The third time she was there was in connection with a small loan made by Mr. Hiller. She had been to see Mr. Hiller and went directly from there to deceased's home. It was late in the evening, and Mrs. Ford conducted her into deceased's bedroom. She stayed only a few minutes. At the time of her marriage in

January, 1922, all the real property deceased had was an equity in the Eleventh East street property of $1,100. His original investment in the business was about $1,000. She thought that at the time they were married she had more property than deceased had. She made a will in his favor, and still had the will. After she made it she placed it in a safety deposit box with the will of deceased, and she and deceased had keys to the box. She had a little real estate in her own name. She acquired it from her own funds. She made deeds to deceased, as well as a will, to take effect upon her death. She did not even know of the first will made by deceased until he came home and told her about it and handed it to her. As to the second will of date April 14, 1924, the occasion for his becoming worried over it was because of a conversation with some attorney at Hot Lake, Or., while he was visiting at the sanatorium. His reasons were explained in a letter witness referred to of date February 20, 1924. After that letter was written deceased returned home the first part of March. He then talked with witness and said he was not satisfied with the will and said there was a loophole in it. Attorneys Hurd & Hurd informed witness it was unnecessary to redraft the will, and she had written deceased to that effect. When he returned, she told him the same thing, but he was very insistent that the first will was not all right and insisted that it be redrafted.

P. J. Moran, for plaintiff, testified that he had lived on East South Temple street, Salt Lake City, for 20 years. During that time his business had been contracting, construction, and paving. He knew deceased during his lifetime and was intimately acquainted with him; had lived neighbors with him for 14 or 15 years and had had occasion to observe his mental condition as to whether he was normal. Witness thought decesaed would average up with most any one, and had observed nothing in his conduct which would indicate he was insane. He thought deceased was far from that. He had had some business matters with him and had never seen anything that would indicate he was

subnormal or abnormal in any way; had never seen anything to indicate that deceased was morally insane over sexual matters, or in any other way.

Dr. John J. Galligan, for plaintiff, testified he resided in Salt Lake City; was 37 years of age; was a physician and surgeon, and a graduate of Creighton University. He stated he had 13 or 14 years of general practice in all classes of cases; that he was now city physician and had held that position for 5 years; that he had read some literature bearing on sexual ailments, and had had experience, in his practice, in such cases. He said, in his opinion, sexual perversion alone is not necessarily evidence of insanity. He said the practice was more common than people can even surmise; that people that had admitted themselves to be sexual perverts were apparently normal in every other way; that there were cases in history where men distinguished in all lines of profession and business were confirmed sexual perverts. He said that it was the overindulgence that weakens the mentality, rather than the methods; that overindulgence in the normal way would have practically the same result. Witness said that the only influence the paramour or companion to the act would have would be as far as the sexual act was concerned; that it would not follow that the undue influence would follow the other afterwards; that it would not necessarily influence the party in other respects. He thought the majority of people were inclined to the natural method. He thought the blood would not be affected except in case of disease.

A. J. Bruneau, for plaintiff, testified he was 50 years of age and has resided in Salt Lake City for 25 years. He knew deceased in his lifetime; that he had had business relations with him, the character of which was hauling sand and gravel, and freighting; that in the course of that business he saw deceased several times a day; that their negotiations commenced in 1924 and continued until a few weeks before deceased's death; that he had occasion to observe his mental and physical condition, and it never entered his mind

that deceased was insane. Witness gave instances of deceased's fitness and accomplishment on particular jobs of magnitude and importance, and found him capable. He said Mrs. Mary Nowlin Ford had the clerical end of a job in which deceased was interested with him. Deceased told witness he did not know how he could get along without her. He did not think deceased was a man that could be easily dominated. He thought he was a man of strong mind.

Drs. Garland H. Pace and Foster J. Curtis, both of Salt Lake City, testified substantially to the same effect as did Dr. Galligan, but their testimony was stricken as being in violation of a rule excluding witnesses, to which rule plaintiff excepted.

Dr. Alfred C. Callister, for plaintiff, testified he resided in Salt Lake City, was a practicing physician and surgeon and a graduate of Harvard Medical School in 1917. He had experience in mental diseases, and had been in consultation with medical experts in mental diseases and insanity cases. He stated the practice of perverted sexual intercourse, called "fellatio" and "cunnilingus," is not regarded as a disease of the mind, nor as an indication or proof of a diseased mind; that a person indulging in that practice would not necessarily be of unsound mind; that it would not necessarily indicate a weakened condition of the will power, or that the party thus indulging would be dominated by the other party. In the opinion of the witness, where both forms of perversion are practiced, neither party would dominate the other.

Dr. John Rees Llewellyn, for plaintiff, testified he resided in Salt Lake City, was a physician and surgeon and a graduate of Rush Medical College; that in the course of his practice he had occasion to examine some sexual perverts; that the perversion charged in this case, did not, in his opinion, necessarily show a diseased or unsound mind. He did not think the practice would have any necessary relation to dominance, one way or the other; that persons addicted in this manner would be able to fully understand important

business and the meaning of agreements, deeds, wills, etc., that they might be called on to execute. Such practices sometimes accompany insanity. It is out of the ordinary to practice cunnilingus. He stated there was such a thing as sexual bondage of one individual to another. He thought it a general rule that the female was more in bondage in sexual matters; that the male is more apt to be dominating than the female.

Mrs. Frances C. Ford, in surrebuttal for defendants, testified to an incident in which she was forced by deceased to submit to the perversion described as "cunnilingus" immediately after a normal act of intercourse with her.

Other incidents and circumstances appear in the evidence not necessary to be stated here. If deemed material, they will be referred to in other connections.

The foregoing statement constitutes the substance of the principal features of the evidence on both sides of the case. We might perhaps with propriety considering the nature of the case have merely drawn our conclusions from the evidence without stating it to the extent we have, but such a course, in the opinion of the writer, would not have been as satisfactory as the course we have adopted.

The trial court in its instructions to the jury briefly stated the grounds upon which the will was contested as follows:

"(1) That at the time of the execution of the will the deceased was not of sound and disposing mind.

"(2) That he was not acting freely and voluntarily, but under the influence of the plaintiff."

The court also instructed the jury that the burden of proof was on the defendants to establish by a preponderance of the evidence one or the other of the grounds referred to.

The further instruction was given defining the terms, "sound and disposing mind," Also, the term "undue influence," in language as follows:

"You are instructed that by the use of the phrases, 'sound and disposing mind,' or 'testamentary capacity,' is meant a rational understanding on the part of the testator, at the time of the making of the will, of the business he was engaged in, of the nature and extent of the property he means to dispose of, of the persons who are the natural objects of his bounty and of the manner in which he wishes to dispose of his property.

"The court further instructs you that undue influence is that degree of importunity which deprives the testator of his free agency, so that the instrument executed under its operation is not his own free and unconditional act. Or, to state in other language, undue influence is any improper or wrongful constraint, urgency, or persuasion, whereby the will of a person is overcome, and he is induced to do an act which he would not do if left to act freely. The extent or degree of the influence is immaterial, if it has that effect, and the test is this, Was the influence, whether slight or great, sufficient to destroy free agency, so that the will in question was the result of the domination of the mind of another, rather than the expression of the will and the mind of the testator?"

The first question therefore is, What evidence is there that the deceased was not of sound and disposing mind when he executed the will?

As hereinbefore stated, there is substantial evidence in the record that deceased indulged in sexual perversions with the plaintiff, as charged in defendants' pleading. There is also the testimony of Dr. Beer, who was personally acquainted with deceased in his lifetime and with his sexual perversions as they had been detailed to him by deceased. He was of opinion deceased was insane as to sexual matters, but he knew him to be a man of good business judgment and able to compete with others in business. Other witnesses testified that in later years deceased appeared to be more irritable and his temper more easily aroused, but no witness testified that there was any failure in his business judgment or in his intelligence which by many witnesses was rated above the average. So that, unless it can be consistently contended that there is something so unreasonable in the terms of the will itself as to suggest that the deceased was not of sound and disposing mind when he made the will,

it seems to the court there is no substantial evidence to sustain the verdict as far as concerns the charge that deceased was not of sound and disposing mind.

By the will he gave all of his property to the plaintiff except the sum of $1 each to his two children, contestants here. As to his right to make such disposition of his property, there can be no question. The court so instructed the jury. The court further instructed the jury that the equity or inequity of the disposition of his property was not an issue in the case and should not be considered by the jury in arriving at a verdict. But notwithstanding these rights of a testator and these limitations upon the functions of a jury, it may nevertheless be true that the provisions of a will may be so unnatural and unreasonable, in view of the circumstances and environments of the testator, as to suggest the idea that he could not have been of sound and disposing mind. We find no such condition in the instant case. The plaintiff and deceased were married in January, 1922. The will in question was executed by deceased in April, 1924. The children of deceased and his only heirs at law had reached the full age of manhood and womanhood and, as far as the record discloses, were able to support themselves. Arthur was 29 years of age, and Beulah 32. There was no evidence in the case that either of them had ever contributed to deceased's means, but there is evidence that plaintiff through her means and efficient services had materially assisted in "placing him on his feet financially," and that whatever property he had accumulated at the time the will was executed he attributed largely to the means she had furnished him and the assistance she had rendered him in his business. The actual value of his property was not made to appear. There is much in the evidence from which it may be inferred that it was only a matter of a few thousand dollars. Neither does it appear that the income from the property, together with the separate property of plaintiff, was more than sufficient for her comfortable support. Besides this, it appears from

the evidence that in 1923, after deceased and plaintiff were married, she made a will in his favor in which she willed all her property to deceased. She also made deeds of her real estate to him in addition to the will. They were placed in a safety deposit box and the will of deceased was placed in the same box, to which both of them had keys. The circumstances all considered, this court would be going a long way to hold that there is anything in the provisions of the will or the disposition of his property to suggest the idea that deceased must have been insane when he executed the will. Besides this, many of his business associates and friends who knew him intimately in his lifetime and gave evidence in the case never saw anything in his conduct or demeanor to cause them to believe he was insane or afflicted with insane delusions. In fact, there is no substantial conflict in the evidence upon that point. Even the testimony of Dr. Beer excludes the idea that deceased was insane in matters of business. The court is of opinion that the making of a will and the disposing of property by will is a matter of business.

There is, however, another question to be determined. Was the execution of the will procured by the undue influence of the plaintiff? No matter how sane deceased was in his business nor how intelligent he was in the ordinary affairs of life, if the execution of the will was procured by the undue influence of the plaintiff, as that term is defined by the trial court in the instructions we have quoted, the will should be set aside. As to that, the question is, What evidence is there of the exercise of undue influence by the plaintiff in procuring the execution of the will? The evidence without conflict shows that deceased executed a former will in September, 1922, after his marriage with the plaintiff, in which he willed her all of his property, expressly excluding Arthur and Beulah from participation in its provisions. The uncontradicted evidence also discloses that plaintiff knew nothing about that will until after it was executed and placed in her hands by the

deceased. Afterwards, and shortly before making the second will, deceased while in Oregon was informed by an attorney that he ought to have made a slight bequest to each of his children, and that unless he did so the will would be invalid. Deceased wrote to plaintiff concerning the matter and informed her he desired to make a change in the will. She called upon the attorneys who prepared the will and informed them of the change deceased desired to make. They informed her it was wholly unnecessary, and she so informed the deceased. Nevertheless the deceased persisted in directing that the will be changed, and it was changed accordingly. This circumstance alone, to some extent, rebuts the presumption, if there is a presumption, that the deceased was subject to the domination of the plaintiff. There is another feature of the evidence, not referred to in our statement of the evidence, which may have a bearing upon this question, one way or the other. The defendants all testified, in effect, that on one occasion in 1918 or 1919, before deceased and plaintiff were married, deceased stated to his family that plaintiff, who was then in the hospital, had willed everything she had to him and wanted him to will everything he had to her with the understanding that a certain amount be given to deceased's wife, Mrs. Frances C. Ford. It does not appear in the evidence that deceased made a will at that time in favor of the plaintiff nor until several years afterwards when she became his wife. So that here is another instance in connection with the making of wills in which it appears the deceased was not dominated or influenced by the expressed wishes and desires of the plaintiff. The defendants themselves testified that deceased was possessed of a strong will, and that his will was law in the family. His associates in business, neighbors, and others intimately acquainted with him, including his attorneys who were subscribing witnesses to the will, testified especially to his indomitable will and expressed the opinion that he was not a man to be dominated or influenced by any one against his will. Conceding, as we must in view of the

testimony of Dr. Beer, that a man who practices that form of sexual perversion described in medical terms as "fellatio" is susceptible of domination by the woman who permits it, is such evidence standing alone sufficient to prove that a will executed by him in her favor was executed under undue influence exerted by her, and therefore invalid? If we consider the further fact that the woman to whom he willed his property was his wife, that she had also previously willed all her property to him and positively denied having sought to influence him to will his property to her, to say nothing of the other circumstances we have enumerated, it can hardly be contended that there is any substantial evidence to prove that the will was executed under the undue influence of the plaintiff. Nor do we find any substantial evidence to justify the conclusion that the deceased was not of "sound and disposing mind" or in any respect lacking in testamentary capacity at the time he executed the will.

We are therefore of opinion the evidence was insufficient to sustain the verdict in which the jury found that the will in question was not the will of the deceased.

Notwithstanding the conclusion we have reached, it cannot be dogmatically asserted that the verdict of the jury was other than what might ordinarily be expected. Some of the testimony on the part of the defendants, especially that of the defendants themselves, was calculated to prejudice even the most profound judicial mind and much more the minds of a jury of laymen whose minds are more susceptible to the influence of passion and prejudice. The most bitter anathema and denunciation of which the English language is capable is wholly inadequate to express the abhorrence one must feel towards the deceased on account of his conduct towards his former wife, as testified to by the defendants. His boasting to her of his sexual relations with his paramour and exploiting his sexual perversions in her presence and hearing were even a worse form of brutality than his violently striking her and threatening her life.

But as we read the record this conduct of deceased reflects no light upon the issue presented here. The question is, Was he insane and lacking in testamentary capacity at the time he executed his will or did he execute the will under the undue influence of the plaintiff, who was then his wife? We find no substantial evidence in support of either of these propositions. Hence our conclusion that the evidence was insufficient to sustain the verdict. For the same reason the judgment entered upon the verdict was against law. We are also of opinion that the motion for a directed verdict for plaintiff should have been granted, and failing in that the court should have granted plaintiff's motion for a new trial. This disposes of many errors assigned by plaintiff.

Many authorities have been cited by each of the parties in support of their respective contentions. The extraordinary length of this opinion forbids our undertaking a detailed review of the authorities cited. Nor is it necessary, in our opinion, for the reason that the law given to the jury in the instructions we have quoted, together with other instructions not necessary to specifically refer to, is in harmony with the general law relating to those subjects, as appears from the authorities cited by the parties. Plaintiff's citations on the question of testamentary capacity are as follows: *Miller* v. *Livingstone*, 31 Utah 415, 88 P. 338; *Anderson* v. *Anderson*, 43 Utah 26, 134 P. 533; *In re Hansen's Will*, 50 Utah 207, 167 P. 256; *In re Swan's Estate*, 51 Utah 410, 170 P. 452; Page on Wills (2d Ed.) vol. 1. §§ 139, 141; notes to *Slaughter* v. *Heath*, 27 L. R. A. (N. S.) 89, 90; *Bohler* v. *Hicks*, 120 Ga. 800, 48 S. E. 306; *In re Jones' Will*, 5 Misc. Rep. 199, 25 N. Y. S. 109; *Lowe* v. *Jones*, 192 Mass. 94, 78 N. E. 402, 6 L. R. A. (N. S.) 487, 116 Am. St. Rep. 225, 7 Ann. Cas. 551; *In re Gorkow's Estate*, 20 Wash. 563, 56 P. 385; *Wickes* v. *Walden*, 228 Ill. 56, 81 N. E. 798.

On the question of undue influence plaintiff cites *In re Hess' Will*, 48 Minn. 504, 51 N. W. 614, 31 Am. St. Rep. 665, note by Freeman 667, 690; Underhill on Wills, § 147;

Page on Wills (2d. Ed.) 729, and cases cited; *Fulton* v. *Freeland*, 219 Mo. 494, 118 S. W. 12, 131 Am. St. Rep. 576-579.

Defendants, apparently, do not seriously controvert the rule enunciated in plaintiff's cases, but contend that they are not applicable to the instant case. They cite the following cases as being more in point upon the question presented here: *Bitner* v. *Bitner*, 65 Pa. 347; *State* v. *Petty*, 32 Nev. 384, 108 P. 934, Ann. Cas. 1912D, 223; *In re Swain's Estate*, 189 Iowa 28, 174 N. W. 493. We are of opinion that these cases, while bearing upon the subject and not entirely without merit, are, nevertheless, distinguishable from the case at bar.

Many other errors are assigned, including misconduct of a juror and errors in the admission of evidence over plaintiff's objection, also errors relating to the special verdict and refusal of the court to instruct the jury as requested by the plaintiff.

As for as concerns the misconduct of the juror and errors in respect to the special verdict, it will not be necessary for the purposes of a new trial to determine these questions. It is not likely that such grounds of objection will occur again. The objection, however, that evidence was admitted over plaintiff's objection presents a more serious question. The question is argued at considerable length by counsel for both plaintiff and defendants in their briefs, and should be determined here. Mrs. Frances C. Ford, divorced wife of deceased, was permitted to testify to certain conduct and language of deceased which occurred during their marriage relation. The question arose at various stages of the trial. We shall select only one or two instances in which the evidence, in our opinion was prejudicial and if incompetent its admission was prejudicial error. We have already referred briefly to one instance in which the witness was permitted to testify that deceased made her get into his bed and after an act of

normal intercourse held her down and practiced cunnilingus upon her against her will. She also testified that on that occasion he beat her until her daughter Beulah came and begged him not to kill her. She also testified to what he said after consummating the act of sexual perversion, but it is unnecessary to state it here. She also testified that while she and deceased were living together she observed that deceased was wearing a suspensory; that she "saw his private parts and it was injured—a running sore." She thought it was diseased. The testimony in both instances was admitted over plaintiff's objection, claiming the privilege of the statute (Comp. Laws Utah 1917, § 7124), which in part reads:

*"Privileged Communications and Rights of Witnesses.* There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate. Therefore, a person cannot be examined as a witness in the following cases:

"1. A husband cannot be examined for or against his wife, without her consent, nor a wife for or against her husband, without his consent; nor can either during the marriage or afterwards, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding committed by one against the other, nor to a criminal action or proceedings for a crime committed by one against the other, nor to crimes referred to in an act making it a misdemeanor to abandon or willfully neglect to provide for the support and maintenance, by any person, of his wife of his or her minor child or children in destitute or necessitous circumstances (sections 8112-8115), and also an act in relation to pandering (sections 8095-8101)."

The trial court was of opinion that anything said by either spouse when the two were alone was privileged under the statute, but that anything seen or observed by the witness was not privileged.

Notwithstanding there are many respectable authorities which hold that anything said or done by either husband or wife, especially when they are alone, is privileged within the meaning of the statute, except such matters as come

within the exceptions expressly mentioned, we are strongly convinced that many things may occur between such parties, even when they are alone, that are not within the spirit and meaning of the statute.

The question here presented turns upon the meaning of the term "communication." The rule announced by the Supreme Court of Indiana in a series of cases appears to us to be within the reason and policy of the statute.

In *Beyerline* v. *State,* 147 Ind. 125, 45 N. E. 772, a case in which the appellant compelled his wife to forge a note, the wife was permitted, over appellant's objection, to testify to the fact. The Supreme Court in passing upon the question, at page 774 (147 Ind. 130), says:

"It is not every conversation between husband and wife, nor every word or act said or done by either in the presence of the other, that is protected under the seal of secrecy, but only such communications, whether by word or deed, as pass from one to the other by virtue of the confidence resulting from their intimate relations with one another. Where the criminal, in seeking advice and consolation, lays open his heart to his wife, the law regards the sacredness of their relation, and will not permit her to make known what he has thus communicated, even as it will not ask him to disclose it himself. But if what is said or done by either has no relation to their mutual trust and confidence as husband and wife, then the reason for secrecy ceases."

Many decisions of the same court are cited in the opinion with sufficient comment to indicate the nature of the matter claimed as privileged.

In 40 Cyc. at page 2356, it is said:

"The rule as to privileged communications does not preclude evidence by one spouse as to the personal injury or violence inflicted upon him or her by the other, or as to ill treatment to which he or she was subjected by the other spouse."

Upon this question, as well as many others, it is to be expected that there will be more or less conflict among the authorities. In some cases the apparent conflict is due to

differences between statutes; in others, there are differences of opinion even where the statutes are substantially similar. It is not necessary in the instant case to undertake to reconcile conflicting opinions. The statute above quoted in the very beginning declares the policy of the law and the reasons for its enactment. Although the statute does not use the term "confidential communication" as do the statutes of some of the states, nevertheless, in view of the disclosed policy and reasons for the statutes, we are of opinion the communication or knowledge imparted must be such as pertains to the confidence of the marriage relation. So interpreted, it would be nothing less than a flagrant travesty to hold that the conduct of the deceased or anything that he may have said in connection with the first incident testified to by the witness is within the privilege. Independent of any adjudicated cases we would feel it our plain duty to hold that such conduct accompanied by whatever language, including the language itself, is not within the privilege of the statute. The other incident testified to, however, seems to us to stand on different ground. There was no violence, actual or threatened, no menacing conduct on the part of the deceased, and no obscene language, yet the witness was permitted to state what she saw and observed as to the physical condition of her husband—something she presumably could not have seen and observed except for the existence of the marriage relation and their living together as husband and wife. She saw and observed his injured parts and was permitted to exploit her knowledge thereof so obtained, together with her opinion that it was a disease. The materiality of the evidence does not conclusively appear. Standing alone, it was not relevant to the issue of insanity, incapacity to make a will, or the undue influence of the plaintiff. But coupled with the testimony of other witnesses, especially that of Dr. Beer, it tended to show that deceased had been bitten in connection with the sexual perversion alleged in defendants' pleading, and relied on by them to defeat the probate of the will. The rule applicable to this

question is well stated by Cyc., supra, at page 2356, wherein it is said:

"The rule precludes testimony by a spouse as to facts which have come to his or her knowledge or under his or her observation by reason of the confidence of the marriage relation. It has been held that the silence of one spouse on a certain subject is within the reason and spirit of the rule which guards confidences between husband and wife."

In 28 R. C. L. at page 526, the rule applicable to the question here is stated as follows:

"The matter that the law prohibits either the husband or wife from testifying to as witnesses by reason of the rule privileging communications between them includes any information obtained by either during the marriage and by reason of its existence. It is not confined to mere statements by one to the other, but embraces all knowledge upon the part of either, obtained by reason of the marriage relation, and which but for the confidence growing out of it, would not have been known."

The rule is stated in a more extended form in *Mercer* v. *State,* 40 Fla. 216, 227, 24 So. 154, 157, 74 Am. St. Rep. 135, 142, wherein the court says:

"But the reason of the rule for excluding the confidences between husband and wife as incompetent matter to be deposed by either of them, though they may be competent witnesses to testify to other facts, is found to rest in that public policy that seeks to preserve inviolate the peace, good order, and limitless confidence between the heads of the family circle so necessary to every well-ordered civilized society. The matter that the law prohibits either the husband or wife from testifying to as witnesses includes any information obtained by either during the marriage and by reason of its existence. It should not be confined to mere statements by one to the other, but embraces all knowledge upon the part of either obtained by reason of the marriage relation, and which, but for the confidence growing out of it, would not have been known. And the same rule prevails in full force even after the marital relation has been dissolved by death or divorce."

In *State* v. *Jolly,* 20 N. C. 108, 110, 32 Am. Dec. 656, 658, the court, in reversing a judgment for error in permitting

a divorced wife to testify on the trial of her former husband charged with adultery, says:

"But it is not enough to throw protection over communications made in the spirit of confidence. The intimacy of the marriage union enables each to be a daily and almost constant witness of the conduct of the other; and thus in fact a confidence, reaching much farther than that of verbal communications, is forced upon each of the parties. What one may even desire to conceal from all human eyes and ears is thus almost unavoidably brought within the observation of the other. The confidence which the law thus extorts as well as that which it encourages, ought to be kept sacred, and therefore the husband and wife are not in general admissible to testify against each other as to any matters which occurred during the relation."

It will be seen from the language quoted that the North Carolina court extends the case even beyond mere confidential communications. The same is true in many other jurisdictions of the country. *Leppla* v. *Minnesota Tribune Co.,* 35 Minn. 310, 29 N. W. 127; *Campbell* v. *Chace,* 12 R. I. 333. See many other cases cited in Encyclopedia of Evidence, vol. 10, under the title "Privileged Communications"; also Cyc. and R. C. L. in the footnotes to the text above quoted.

We cannot avoid the conclusion that the wife of deceased was incompetent to testify as to what she observed concerning the condition of deceased, the nature of the injury, and her opinion that it was a disease. Had it not been for other evidence in the case tending to show the cause of such injury, there would be some grounds for treating the evidence as harmless, but, connected as it is, we are of opinion it was prejudicial and that its admission over plaintiff's objection was reversible error. In arriving at this conclusion we have not overlooked the fact that defendants' counsel rely on certain decisions of this court interpreting the privilege statutes relating to attorneys and clients, physicians and surgeons, and the statute prohibiting certain persons from testifying where facts were equally within the

knowledge of the deceased. We have been unable to find in our researches any case or statement by any text-writer that applies to a case of this nature the rule applied in the cases relied on by defendants. The cases referred to are *Miller* v. *Livingstone*, 31 Utah 415, 88 P. 338; *In re Young's Estate* 33 Utah 382, 94 P. 731, 17 L. R. A. (N. S.) 108, 126 Am. St. Rep. 843, 14 Ann. Cas. 596; *Grieve* v. *Howard*, 54 Utah 225, 180 P. 423.

As appears already from what has been stated, the statute which prohibits either husband or wife, without the consent of the other, from being examined, either during the marriage or after, as to any communication made by one to the other during the marriage was intended to safeguard the peace of the family and protect the closest and most sacred relation existing among civilized men. The disturbance of that relation by anything calculated to destroy the confidence of one in the other is certainly more far-reaching in its disastrous consequences than is possible in any other relation covered by the privilege statutes. The analogy between those statutes and the statute with which we are concerned in he case at bar is too remote to justify the court in following the lead of the cases referred to by defendants' counsel. With this explanation of our views we deem it unnecessary to consider the cases in detail.

Many requests for instructions were requested by plaintiff which were refused and the rulings assigned as error. Some of those requests were objectionable as tending to indicate the leaning of the court; others were fairly covered by the instructions given. Most of them on the subject of insanity and undue influence were merely amplifications of the instructions given. The court is of opinion, however, that plaintiff's request No. 15 was not sufficiently covered by the instructions given, and in view of the issues and established facts plaintiff was entitled to such instruction, or one substantially similar. As this is important only for the guidance of the trial court upon a new trial, it is not necessary to quote instruction requested.

Prior to the oral argument of the case in this court defendants' counsel filed a motion to strike the bill of exceptions. The bill was served in time, and the objections thereto are hypercritical and without merit. The certificate of the court in settling and allowing the bill is a complete answer to every material objection raised by defendants. The certificate is conclusive and the court is bound thereby. In *re Jones' Estate*, 59 Utah 99, 202 P. 206. The motion to strike is denied.

For the reasons stated, the judgment is reversed and the cause is remanded for a new trial, at respondents' cost.

CHERRY, STRAUP, HANSEN, and GIDEON, JJ., concur.